# IN THE SUPREME COURT, STATE OF WYOMING

## 2017 WY 35

OCTOBER TERM, A.D. 2016

*March 30, 2017*

LANDON GREGORY GREER,

**Appellant**
**(Defendant),**

**v.**

S-16-0181

ALBA ROSY GREER,

**Appellee**
**(Plaintiff).**

*Appeal from the District Court of Park County*
*The Honorable John A. Fenn, Judge*

*Representing Appellant:*
Christopher J. King of Greear Clark King, P.C., Worland, Wyoming

*Representing Appellee:*
Alex H. Sitz, III of Meinecke & Sitz, LLC, Cody, Wyoming

*Before BURKE, C.J., and HILL, DAVIS, FOX, and KAUTZ, JJ.*

**NOTICE: This opinion is subject to formal revision before publication in Pacific Reporter Third. Readers are requested to notify the Clerk of the Supreme Court, Supreme Court Building, Cheyenne, Wyoming 82002, of any typographical or other formal errors so that correction may be made before final publication in the permanent volume.**

**DAVIS**, Justice.

[¶1]    Landon Gregory Greer (Father) and Alba Rosy Greer (Mother) were divorced in October of 2014, while both lived in Cody, Wyoming.  Mother received custody of the children, and Father was awarded liberal visitation tailored to his seasonal work schedule. When Mother was unable to find suitable employment in Cody, she found a job in Arizona, and moved there with the children after giving Father notice of the move. Mother filed for a change in Father's visitation, and Father cross-filed for a change in custody and to have Mother held in contempt.  The district court declined to change custody or to hold Mother in contempt.  Father appealed, contending that both decisions were an abuse of discretion.  We affirm.

## ISSUES

[¶2]    We restate the issues presented as follows:

1.    Did the district court abuse its discretion when it did not change custody from Mother to Father after Mother relocated from Cody, Wyoming to Chandler, Arizona?

2.    Did the district court abuse its discretion in failing to hold Mother in contempt after Father was unable to exercise visitation ordered in the decree due to her move to Arizona?

## FACTS

[¶3]    Mother was born in the Dominican Republic, and she and Father met when he was on a church mission there.  After his mission was complete and he had returned to the United States, Father went back to the Dominican Republic and asked Mother to marry him.  She agreed and immigrated to Cody, Wyoming, where Father resided.  They were married a few months later.

[¶4]    Mother was able to learn English, obtain citizenship, and complete an online bachelor's degree in criminal justice from the University of Wyoming.  During the marriage, Father worked in the family paving business, and Mother was a stay-at-home mom.  Father also served on the Cody City Council.  The couple had two children, DBG (male, born 2006) and MRG (female, born 2008).

[¶5]    The relationship began to unravel, and Mother filed for divorce early in 2014. Custody and financial issues were hotly contested in a two-day divorce trial held in September 2014.    The district court entered a comprehensive divorce decree memorializing the above facts on October 21, 2014.  The court declined to award joint

1

physical custody as requested by Father, and instead awarded Mother primary physical custody.

[¶6]    However, the court awarded Father liberal visitation, including six consecutive weeks during January through March when he was not so busy in the paving business. Mother was awarded the marital home.

[¶7]    Mother was unable to obtain suitable employment in Cody after the divorce.  She later testified that she applied for approximately thirty jobs, including at a fast-food restaurant and Walmart.  She was able to work part-time cleaning houses and teaching Zumba classes.  Her employment prospects were probably not enhanced by criminal charges involving an altercation with Father involving a firearm.  She was charged with domestic battery and reckless endangerment.  She was ultimately allowed to plead guilty to only one of the charges and received a deferred sentence under Wyo. Stat. Ann. § 7-13-301.[1]  She later testified that she was placed on probation for a year, which had almost elapsed without a violation at the time of the custody hearing involved in this appeal. The guilty plea was accepted but not entered by the court, and if Mother successfully completes her probationary period, she will not have a criminal record on this charge, as it will be dismissed.

[¶8]    Mother was not able to keep up with her financial commitments, and so she made an arrangement with a friend to transfer her an interest in the marital home she had received in the divorce in exchange for a line of credit of up to $100,000.  By February of 2016, she had borrowed around $70,000 against the home.

[¶9]    After taking a trip to Phoenix, Mother eventually decided that she would look into employment in that area.  Her preliminary inquiries generated interest from prospective employers – her ability to speak both Spanish and English made her more employable in an area with a larger Hispanic population.  She was eventually offered a job as a receptionist at the Maricopa County Public Defender's office in the Phoenix area.  It paid around $10.00 per hour and included benefits.

[¶10]  Mother notified Father of her intention to move with the children on June 3, 2015, and filed a notice of address change as required by the parties' divorce decree on June 12. She also filed a motion for change of Father's visitation to adjust to the planned move on June 19.  Father responded with a petition to modify custody, support, and visitation, asking the court to award him primary custody and to otherwise modify the decree to adjust to this change.  He also asked the court to hold Mother in contempt because (we infer) he was not able to exercise his regular visitation due to the move.[2]

---

[1] The record does not tell us which.

[2] These documents were not made part of the record on appeal.  Our review is therefore limited to the district court's summary of them and the hearing transcript.

[¶11]   Meanwhile, Mother encountered complications with her plan to go to work for the Maricopa County Public Defender's office.  Arizona requires a person who works for governmental entities or in child or elder care to have an IVP[3] card.  We gather from the record that when one applies for such a card, she is fingerprinted and her criminal record is checked.  Mother was notified that she did not qualify for a card because of the Cody charges or deferral.

[¶12]   However, an exception can be made for good cause.  Mother was able to obtain support from members of the Cody community, including the judge who sat on her criminal case, and she eventually received the required card under the good-cause exception.  Father points out that she moved to Arizona without a job, because she could not be employed at the public defender's office without the card.  She was unemployed from June until September, waiting for the card.

[¶13]   In the meantime, Mother found a different job as a substitute teacher at a charter school, working for a private company that supplies substitutes to schools.  That job paid $22.00 per hour, with no benefits, on a contract basis.  Mother worked 25 to 30 hours per week, which allowed her to get her children ready for school and meet them at the end of the school day.  At the time of the custody hearing, she had been offered a permanent position with the charter school at which she had been a substitute.  This position will provide benefits.  She was not sure of the salary or hourly rate of her new job at the time of the hearing.

[¶14]   The children attend a school which has a number of two-week breaks throughout the year, rather than a traditional long summer break.  Father is unable to exercise the six continuous weeks of visitation during the slow season for paving that he received under the decree because of the school schedule and distance between the parties.

[¶15]   In the meantime, Father's life also changed.  He remarried to a woman who has four children by a previous marriage.  The couple was expecting another child in June of 2016 when the hearing in this matter was held.  The four children are similar in age to Mother and Father's two children, and they get along well and enjoy spending time with each other.

[¶16]   The parties transport the children for visitation via an economy airline that flies from Mesa, Arizona to Billings, Montana, and then by automobile.  They have had the kinds of disputes about timing, etc., that are common in these emotionally-charged situations when there is not yet a court order specifically delineating the parties' rights and responsibilities.

---

[3] The card is incorrectly referred to as an IBP card in the transcript.

[¶17] The district court held a hearing on the pending motions on February 19, 2016. It issued a comprehensive order on April 11, 2016. The parties agreed that there had been a material change of circumstances that allowed the court to revisit custody and visitation under Wyo. Stat. Ann. § 20-2-204(c) (LexisNexis 2015). The court therefore analyzed the factors contained in Wyo. Stat. Ann. § 20-2-201 (LexisNexis 2015):

(i) *The quality of the relationship each child has with each parent.* The court found that this factor did not weigh in either parent's favor, although it noted that Father could perhaps have done more to maintain the relationship after Mother moved to Arizona.

(ii) *The ability of each parent to provide adequate care for each child throughout each period of responsibility, including arranging for each child's care by others as needed.* The court found that both parents were satisfactory in this area, and that the factor did not weigh in favor of either.

(iii) *The relative competency and fitness of each parent.* The court found both parents competent and fit. However, it noted that Father would have seven children to care for if custody were changed, and that Mother would have more time and attention to devote to the couple's two children than Father as a result. It therefore weighed the factor slightly in Mother's favor.

(iv) *Each parent's willingness to accept all responsibilities of parenting, including a willingness to accept care for each child at specified times and to relinquish care to the other parent at specified times.* The court found that the parties were willing to accept the responsibilities of parenting, but that Mother has been the primary caregiver for the children, and that removing them from her care would be devastating to them. It noted that the parties had had some disagreements regarding the children after Mother moved. It concluded that the first part of the factor weighed in Mother's favor, and the second was neutral.

(v) *How the parents and each child can best maintain and strengthen a relationship with each other.* The court found that Mother had done as much as she could to help Father maintain his relationship with the children. She sent him text messages and emails updating him on their activities, and purchased the children watch phones so that he could call them when he wished, and they could do the same. On the other hand, Father had not taken advantage of these tools to the extent he could have. It therefore weighed this factor in Mother's favor.

(vi) *How the parents and each child interact and communicate with each other and how such interaction and communication can be improved.* The court found that the parties had problems communicating with each other, and that this factor was neutral.

4

(vii)    *The ability and willingness of each parent to allow the other to provide care without intrusion, respect the other parent's rights and responsibilities, including the right of privacy.*  Neither parent scored well on this factor, and thus the court found that it did not weigh in favor of either.

(viii)    *Geographic distance between the parents' residences.*  The parties live over 1,000 miles apart.  That factor did not weigh in favor of either party, but the court observed that it impacts the custody and visitation it is able to award.

(ix)    *Current physical and mental ability of each parent to care for each child.*  Both parents were found to be capable of caring for each child, and thus the factor was found to be neutral.

(x)    *Other factors the Court deems necessary and relevant.*  The court noted that because this case involves relocation, it had to balance certain other factors identified in *Arnott v. Arnott*, 2012 WY 167, ¶¶ 30-31, 293 P.3d 440, 454 (Wyo. 2012), and other cases preceding it.

a.    *Whether an established custodial environment continues to exist despite a change in the children's domicile.* The court found that it did, because Mother had always been the primary custodial parent, and to change that would upend that historic arrangement.

b.    *The attributes and characteristics of the parents and children and how the children have fared under the original custody and visitation arrangement.*  The court noted that the children had fared well under the original custody arrangement.

c.    *The relocating parent's motives for proposing the move.*  Mother established that she moved in order to find employment that would allow her to support herself and the children.  Although she made a false start due to the initial inability to get an IVP card, she obtained a position that paid relatively well and would soon be in a full-time teaching position with benefits.[4]  She should not have to exhaust the equity in the home awarded her in the divorce to support herself.  The court found itself extremely reluctant to force Mother to return to an area where she cannot support herself or the children.[5]

d.    *Whether reasonable visitation is possible for the remaining parent.*  Because the children have multiple extended breaks during the school year in Arizona,

---

[4] Mother testified that her new employer will allow her to begin work as she did when she was a substitute so that she can get the children ready for school.

[5] Mother testified at the hearing that if the court changed custody to Father, she would return to Cody because she would not be separated from her children, regardless of how difficult that would be – even if she had to "eat rock and drink water."

Father can have extended time with them during these periods. He can also exercise additional visitation with them in Arizona if he chooses. Therefore, although it will be diminished from that ordered under the decree, Father could still have reasonable visitation.

[¶18] The court concluded that it was in the children's best interest for Mother to continue as the primary custodial parent. It made modifications to the decree to provide Father as much visitation as possible under the changed circumstances. Finally, it declined without elaboration to hold Mother in contempt. Father timely perfected this appeal.

## DISCUSSION

### A. Determination to Allow Mother to Have Continued Primary Custody

[¶19] Our standard of review in challenges to custody decisions is well-established.

> We review orders modifying custody, visitation, and child support for an abuse of discretion and will not disturb an order regarding custody or visitation so long as the court could reasonably conclude as it did. *Roemmich v. Roemmich*, 2010 WY 115, ¶ 7, 238 P.3d 89, 92 (Wyo. 2010). We evaluate the reasonableness of a decision in relation to the evidence presented, viewing it in the light most favorable to the district court's determination, affording every favorable inference to the prevailing party, and ignoring any conflicting evidence. *Jensen v. Milatzo-Jensen*, 2013 WY 27, ¶ 7, 297 P.3d 768, 772 (Wyo. 2013).

*Tracy v. Tracy*, 2017 WY 17, ¶ 46, 388 P.3d 1257, 1267 (Wyo. 2017).

[¶20] We have not underestimated the difficulties district judges face when dealing with custody disputes when one parent relocates. Disputes arising from the relocation of a custodial parent "present some of the knottiest and most disturbing problems that our courts are called upon to resolve." *Tropea v. Tropea*, 665 N.E.2d 145, 148 (N.Y. 1996).

> Relocation cases are "intractable problems" and the "San Andreas fault" of family law. When one parent attempts to move a child a significant distance from the other parent, the child's relationship with each parent changes in quality and quantity. These "no-win" cases are occurring with increasing frequency, create enormous tensions for parents and their children, and burden the legal system and the judges who

6

have to decide them. A potential relocation can generate conflict in cases where there had been none before, reopen old wounds in others, or exacerbate an already highly-conflicted situation. Unfortunately, such cases are increasingly common.

*Arnott*, ¶ 12, 293 P.3d at 444 (quoting Linda D. Elrod, *National and International Momentum Builds for More Child Focus in Relocation Disputes*, 44 Fam. L.Q. 341, 341-42 (2010)).

[¶21] Father contends that the district court abused its discretion because of the impact of Mother's move on his visitation rights, because the custody arrangement was working well in Cody before the move, and because Mother relocated to Arizona with only the hope of getting a job. He also contends that the decision places the onus on him to exercise reasonable visitation. He further argues that there was no evidence that Father's new family and expected baby would impact his ability to parent DBG and MRG. Finally, he points out that the district court declined to increase the value of Mother's child support obligation because the change in her earnings would be three percent or less, meaning that she has not received a significant economic benefit from the move so far.[6]

[¶22] We perceive Father' claims in this appeal to ask us to weigh the evidence differently than the district court did, which we will not do. *Tracy*, ¶ 47, 388 P.3d at 1267. For whatever it is worth, Mother did have a job offer before she moved to Arizona, and ran into a snag when she learned of the need for an IVP card, then recovered nicely by getting the card and finding a job that paid even better and allowed her to provide good care to the children. If Father is attempting to insinuate that Mother moved for the purpose of interfering with his visitation, the record simply does not support that assertion. Mother could not find suitable employment in Cody and was rapidly sinking deeper in debt, and then learned that her skills, including her ability to speak Spanish and English fluently, were in greater demand in Arizona than they were in Cody.

[¶23] When we view the record in the light most favorable to Mother and the district court's decision, we find that the court appropriately evaluated and weighed the factors contained in § 20-2-201, and that the record supports its conclusions. The court found that Mother had been the children's primary caregiver and that changing that would impact them negatively, and that she had made good efforts to facilitate a relationship with Father. It found that the increase in the size of Father's family from two to seven would impact his time with the children, which only seems to be common sense. The court was reluctant to separate Mother from her children or force her to return to a place

---

[6] The court imputed income in the decree at $1,200 per month, even though Mother wasn't making that much. It initially believed she would eventually find work in Cody.

where she could not support herself or provide her share of support for the children. It did the best it could to assure Father as much visitation as possible under the circumstances, and it ordered Mother to bear half of the cost of visitation.

[¶24] It is true that this arrangement is not as favorable to Father as the one originally decreed. We understand his disappointment – as the district court found, Father is a capable and loving parent who now cannot see his children as much as he (and probably they) would like. However, at the end of the day, the statutory analysis of the best interests of the children led the court to maintain Mother as the custodial parent, although it was a relatively close and probably agonizing call. We are in no position to second-guess that decision in this difficult case. There was no abuse of discretion.

## B.    Contempt

[¶25] For reasons we will explain below, we would be justified in refusing to consider Father's argument concerning his efforts to have Mother held in contempt. However, because of the prevalence of these efforts in domestic relations cases, we will take a moment to touch on the requirements for contempt. We note that domestic relations cases involve the same rules governing contempt as other cases.

[¶26] There are two general types of contempt, civil and criminal, as well as direct criminal contempt. It is clear that direct criminal contempt, a contempt occurring in the presence of the judge, is not an issue in this case, and we will not discuss it further. *See* W.R.Cr.P. 42(b), allowing summary punishment of direct contempt.

[¶27] As to indirect civil and criminal contempt, we are unable to determine from the record of which type of indirect contempt Father sought. As a result, we will discuss both types. We have explained:

> A contempt is considered civil when the punishment is wholly remedial, serves only the purposes of the complainant, and is not intended as a deterrent to offenses against the public. A civil contempt is generally intended to compel a party to comply with a lawful court order while a criminal contempt is punitive in nature and is enforced so the authority of the law and the court will be vindicated. Stated simply, the primary purpose of criminal contempt is to punish while the primary purpose of civil contempt is to coerce. Appellate courts are obligated to decide whether a contempt is civil or criminal based on the reasons for a particular penalty.

*Stephens v. Lavitt*, 2010 WY 129, ¶ 15, 239 P.3d 634, 638-39 (Wyo. 2010) (citations omitted).

8

[¶28] Criminal contempt is a crime in every fundamental respect, and may be used to punish, *inter alia*, "disobedience of any lawful judgment, order, or process of the court." *Weidt v. State*, 2013 WY 143, ¶ 20, 312 P.3d 1035, 1040 (Wyo. 2013) (citing *In re BD*, 2010 WY 18, ¶ 4, 226 P.3d 272, 273 (Wyo. 2010) (quoting *Swain v. State*, 2009 WY 142, ¶ 13, 220 P.3d 504, 508 (Wyo. 2009)); W.R.Cr.P 42(a)(2)(C). An indirect criminal contempt proceeding must be brought in a separate criminal proceeding from the one in which the alleged contempt occurred. *Swain*, ¶ 17, 220 P.3d at 509; *see also In re BD*, ¶ 5, 226 P.3d at 274 (citing a series of cases holding the same over decades). The State has the burden of proving the elements of indirect criminal contempt beyond a reasonable doubt, as it must prove the elements of any crime. *Weidt,* ¶ 20, 312 P.3d at 1040.

[¶29] Civil contempt requires proof of the following elements by clear and convincing evidence: "1) an effective court order that required certain conduct by the alleged contemnor; 2) the contemnor had knowledge of the order; and 3) the alleged contemnor disobeyed the order." *Shindell v. Shindell*, 2014 WY 51, ¶ 10, 322 P.3d 1270, 1274 (Wyo. 2014). Once those elements are proven, the burden shifts to the person charged with contempt to show he or she was unable to comply – i.e., that the failure to comply was not willful. *Id.* The court may allow a civil contemnor to purge the contempt by taking certain actions. *Meckem v. Carter*, 2014 WY 52, ¶ 19, 323 P.3d 637, 644 (Wyo. 2014); 17 Am. Jur. 2d *Contempt* §§ 204, 205 (2004). A court may also award damages as a form of compensatory contempt to redress contumacious acts if it has the evidence to establish the amount of damage. *Walker v. Walker*, 2013 WY 132, ¶ 39, 311 P.3d 170, 178 (Wyo. 2013).

[¶30] We will not disturb a lower court's ruling on an application for civil contempt unless there has been a serious procedural error, a violation of a principle of law, or a clear and grave abuse of discretion. *Roberts v. Locke,* 2013 WY 73, ¶ 14, 304 P.3d 116, 120 (Wyo. 2013).

[¶31] We are unable to review Father's claim for the following reasons. We can see from the Clerk of Court's index that Father filed a Motion for Order to Show Cause, which we assume was the document initiating the contempt process. However, the motion itself is not in the record. We have the transcript of the custody hearing, but there is no meaningful discussion of contempt. As a result, we have no way of knowing whether Father sought to have Mother punished in some fashion, which would be criminal contempt. If he sought punishment, the district court had no jurisdiction because there was no separate criminal case. *Swain,* ¶ 17, 220 P.3d at 509.

[¶32] If this was a request to have Mother held in civil contempt, Father does not identify the provision of the decree he claims was violated. We can see from the custody hearing transcript that he claims Mother violated the decree because he could not exercise his ordered visitation due to the distance between them after she moved. However, the

decree did not (and probably could not)[7] prohibit Mother from moving out of state. It provided that the parties must give notice of a change of address so long as there was a support obligation, and she did so. We have been provided with no authority indicating that a custodial parent may not move without prior court approval if to do so would impact the noncustodial parent's visitation, and we have no intention of launching into those uncharted waters without some sound legal basis to do so. Father likewise provides us with no argument as to why Mother's choice to move would be sufficiently willful under these circumstances, when she was unable to support herself and her children in Cody, but found gainful and appropriate employment in Arizona.

[¶33] Finally, we are unable to determine what coercive sanction Father was asking for due to the lack of a record on that issue. We have held that appellants must provide this Court with a record sufficient to allow adequate appellate review. *Roberts,* ¶ 27, 304 P.3d at 122. In the absence of such a record, we presume that there were no irregularities in the district court's judgment, and that it was reasonably based on competent and sufficient evidence. *Id.* (citing *Golden v. Guion*, 2013 WY 45, ¶¶ 4-5, 299 P.3d 95, 96-97 (Wyo. 2013); *Chancler v. Meredith*, 2004 WY 27, ¶ 5, 86 P.3d 841, 842 (Wyo. 2004); *Stadtfeld v. Stadtfeld*, 920 P.2d 662, 664 (Wyo. 1996)).

[¶34] We have also held that we will not consider issues which are not clearly defined or supported by proper citation or cogent argument. *Poitra v. State*, 2016 WY 20, ¶ 22, 368 P.3d 284, 289 (Wyo. 2016) (citing *Manzanares v. State*, 2015 WY 63, ¶ 18, 349 P.3d 969, 972 (Wyo. 2015)). Father has not cited us to legal authority or provided cogent argument which would allow us to evaluate the district court's ruling in light of the facts as they may or may not prove the elements of civil contempt, whether the standard of proof was met, and why Mother did not prove that her contempt was not willful, if there was in fact a violation of the decree.

[¶35] We have said all of this not to pick on Father or his counsel – efforts to have a former spouse held in contempt are not uncommon – perhaps they are the rule rather than the exception. We merely make the point that an allegation of contempt is serious, and that the rules governing contempt are specialized and complex. As emotionally

---

[7] In *Watt v. Watt*, 971 P.2d 608 (Wyo. 1999), the decree contained a provision providing for an automatic change of custody if the custodial parent moved more than fifty miles from Upton, Wyoming. The district court there refused to enforce the provision, and this Court adopted a rule that a change of residence could not alone be considered a material change of circumstances to allow a reevaluation of custody. *Id.* at 614-17. *Arnott* overruled *Watt* on this point, holding that relocation by the custodial parent may be a material change of circumstances, and noting that "[u]ltimately, we agree with the conclusion reached in other jurisdictions that presumptions in favor of one parent or another are detrimental to the interests of all parties in cases involving modification of child custody based on relocation of a custodial parent." 2012 WY 167, ¶ 38, 293 P.3d at 457. There is no reason that a provision in a divorce decree should fare any better than a presumption. As we recently noted, district courts can protect a child from the adverse consequences of a move through the use of a temporary custody hearing and order. *Tracy,* ¶¶ 25-31, 38 P.3d at 1263-64.

gratifying as it can evidently be to lodge a complaint that an ex-spouse is in contempt, such a claim should not be undertaken lightly. At the end of the day, we have no basis to conclude that the district judge erred in refusing to hold Mother in contempt, or that he even could have.

## CONCLUSION

[¶36]   We find no error in the district court's ruling, and consequently affirm.