KAUTZ, Justice.
*814 [¶1] Appellant Matthew T. Jacobson (Father) appeals from the district court's order denying his petition to modify the order granting Appellee Aimee V. Kidd (Mother) primary custody of their children. Father claims the district court abused its discretion by concluding he had not shown a material change in circumstances to warrant modification of the order. Mother did not file a brief on appeal.[1]
[¶2] We reverse and remand.
ISSUE
[¶3] The dispositive issue in this case is: Did the district court abuse its discretion by concluding that Father had not demonstrated a material change in circumstances to justify re-opening the custody and visitation order?
FACTS[2]
[¶4] Mother and Father married in 2007, and two daughters were born to them - MJ in 2007 and KJ in 2008. Mother already had two sons from a prior marriage to Chris Jones - CJ and ZJ. Mother and Father divorced in 2009, and the district court awarded Mother primary physical custody of the girls. Father was awarded visitation in a complicated order organized around his work schedule, but generally included visitation from Thursday at noon until Sunday at 4:00 p.m. on alternating weeks. Also, during the "off week" (when Father did not have the girls from Thursday to Sunday), Father was entitled to one overnight visitation. The order included a holiday visitation schedule and a summer visitation schedule which allowed longer consecutive periods of visitation as the girls got older. In addition, the order stated that "[e]ach party shall have the right of first refusal for watching the children when the other parent is in need of child care for a period of more than two (2) consecutive hours."
[¶5] On August 15, 2011, Father filed a petition to modify the divorce decree to give him sole custody of the girls. He alleged:
1) Mother had attempted suicide by taking an overdose of medication while the children were in her care;
2) Mother filed a false report that, while working as a registered nurse, Father stole medication from his employer;
3) On June 9, 2010, while having custody of the children, Mother was arrested for public intoxication and urinating on Father's ex-girlfriend's lawn; and
4) Mother did not abide by the visitation requirements of the divorce decree.
[¶6] The parties reached a settlement during a September 22, 2011 hearing on Father's modification petition. For reasons not evident in the record, an order on the settlement agreement was not entered for eight and one-half months. On June 5, 2012, the district court entered a stipulated and modified decree of divorce. The order continued the provisions *815 of the original decree not modified, including that Mother was the primary custodian, but contained the following changes:
1) Father was given visitation with the girls every other Wednesday from approximately 3:30 p.m. to Sunday at 5:00 p.m.
2) If Father moved to Casper (which he did), he was given "the option of two overnight[ ]s (3:30 p.m. to 8:00 a.m.) with the children in his 'off-week' (not consecutive and not on the weekend)."
3) Mother was required to engage in professional counseling and provide Father with sufficient evidence that she was "attending counseling as recommended by the counselor of her choosing."
4) Mother and Father agreed to "contact each other immediately in the event any situation arises whereby they are unable to personally care for the children. Should this situation arise, the parent who cannot personally care for the children shall allow the other parent to have the children during this time.
[¶7] On September 29, 2015, Father filed the current petition to modify custody, visitation and child support, requesting primary custody of the girls. He asserted that there had been a material change in circumstances since the 2012 modification because Mother had attempted suicide for a second time and she was "unstable and unfit to have primary custody of the children." On January 8, 2016, Father filed a motion to show cause as to why Mother should not be held in contempt of court. He alleged Mother violated the terms of the modified decree in numerous instances.
[¶8] The district court held an evidentiary hearing on Father's modification petition and motion to show cause on May 9-10, 2017. At the hearing, evidence was presented showing the following incidents involving Mother:
• In March 2012, Mother's boyfriend, Ty Lorenzen, held her and MJ hostage inside his house with a gun.[3] Mother texted Father during the standoff, and he retrieved the child through a window. Father called the police to report the incident and they arrived with "rifles and guns" and blocked off the street. The police got Mr. Lorenzen out of the house, and Mother "was safe at that point."
• Father testified that he talked to Mother after the event about "why this can't happen" and "he [Mr. Lorenzen] can't be around our kids anymore." Mother testified that she continued her relationship with Mr. Lorenzen for only one week after the March 2012 incident.
• However, on September 1, 2012, Mother was arrested for being a pedestrian under the influence on a roadway when she was found walking down the highway intoxicated. She had been in a pickup with Mr. Lorenzen, and he was arrested for driving while under the influence. Mother resisted the deputies' attempts to place her in the patrol vehicle. She later claimed Mr. Lorenzen had beaten her.
• On Labor Day 2012 or 2013,[4] Mother was arrested. She claimed that Mr. Lorenzen beat "the crap" out of her and she thought the police were going to help her. Instead, they arrested her and eventually "hogtied her."
• In November 2012, a report was made to police that Mr. Lorenzen was suicidal. At the evidentiary hearing in this case, Mother denied that Mr. Lorenzen was suicidal. She apparently told the officers that Mr. Lorenzen had grabbed her by the throat, but then explained that they were "trying to get [Mr. Lorenzen] out of [trouble for] beating the crap out of *816 [her]" by saying Mr. Lorenzen was suicidal. Mother initially refused to give a statement to the police. She eventually gave a statement, although she admitted she "certainly didn't want to." She stated that she had a visible injury, but she refused to allow the police to photograph it.
• On January 18, 2013, a friend of Mother's called the police for a welfare check on Mother. The friend reported that Mother "was in a bad relationship with a male named [Mr.] Lorenzen" and she had told him to "call police immediately if [the friend] knew Lorenzen was at [Mother's] residence." When the police arrived at her house, Mother confirmed Mr. Lorenzen was there and said that they "had worked out their issues and were back together."
• In January 2013 or 2014, Mother called the police asking for a civil standby while Mr. Lorenzen removed his belongings from her residence. She stated that she wanted to get the children away from the residence before he came to get his belongings.
• In March 2013 or 2014, Mr. Lorenzen shot himself in the head while Mother was present. Shortly after that incident she requested a protection order because he was harassing her by calling her from the Wyoming Behavioral Institute. She also posted on Facebook that if Mr. Lorenzen ever came near her or her children she would kill him. Mother stated it was "the last straw" and "he couldn't be around us anymore."
• In early 2014, Mother had a child, BK, with Sergio Hernandez. She denied having an on-going romantic relationship with Mr. Hernandez and stated that her other children did not know him until after she was pregnant.
• On January 10, 2014, Mother called the police alleging that Father had dropped KJ off at her house when she was not home. Father claimed that Mother was home and was just trying to get him in trouble.
• On June 28, 2014, Mr. Hernandez told police that Mother arrived at his residence drunk and tried to have sex with him.
• On October 18, 2014, Mr. Hernandez died of an apparent drug overdose. Mother testified that Mr. Hernandez was "over served alcohol, blood poison. He had sleep apnea, and I believe he had some narcotics on board as well." She also testified that, more than once, she let Mr. Hernandez "sleep it off" on her couch. Mother, however, denied that the children were aware of "his issues."
• On February 21, 2015, the police were called to a fight at a bar in Casper. It is unclear from the record whether Mother was involved in the fight, but she was at the bar during the fight and was required to leave. An officer testified that Mother was intoxicated and, had she not taken a taxi home, "she probably would have wound up going to jail for public intoxication."
• On September 7, 2015, another of Mother's ex-boyfriends, Christopher Edmonds, called the police to report that Mother came to his house unannounced. She drank "a few beers" and tried to get in bed with him. He got out of bed and told her to go home. He stated that Mother then locked herself in the bathroom, where later he found her lying on the floor with an empty bottle of hydrocodone nearby. When the police arrived, Mother and Mr. Edmonds were sitting on the couch. She denied taking the pills and stated she was just "trying to coerce Mr. Edmonds into showing her love and give her affection." Mother was arrested for interference with a peace officer because she gave the officer false information about her name, date of birth and telephone number.
• On October 10, 2015, Father enrolled the girls in counseling. When Mother found out, she called the counselor and said she was the primary custodian and she did not want them in counseling.
• On January 29, 2016, Mother and Sonny Ramirez went out drinking.
• On January 29 or 30, 2016, Mother and Sonny Ramirez had sexual relations. She stated that, when she woke up the next *817 the morning, she felt like she had been "hit by a bus. Couldn't get out of bed, couldn't remember the night before in its entirety." Facebook posts from that period showed that two-year-old BK was in bed with Mother and Mr. Ramirez during the night.
• Mother later learned she was pregnant. She stated that she did not remember the sexual encounter and reported to police that she had been raped. The child was born in October 2016.
• On September 20, 2016, the police were called regarding Mother's Facebook post about a bonfire at Chris Jones' place involving his fiancé's belongings. The post apparently followed an altercation earlier in the day between Mother and the fiancé.
• In October 2016, Mother agreed to allow MJ and KJ to receive counseling.
• On December 26, 2016, Mother had an altercation with Mr. Ramirez at a bar, and the police were called.
• Also, on December 26, 2016, KJ injured her leg while playing on a trampoline at Mother's house. Mother did not think the injury was serious and treated it with ice and elevation.
• On December 28, 2016, Mother took KJ to the emergency room, where they learned she had a broken tibia and fibula. The leg was so swollen, it could not be casted. At the time of the hearing, the child's leg that had been broken was significantly smaller than the other and she still walked with a limp. Mother looked into physical therapy for the child, but did not find a suitable therapist.
• The authorities investigated the alleged rape and decided not to charge Mr. Ramirez.
• Mother started a public campaign to bring attention to her rape and victims' rights. She gave a public statement at a Casper city council meeting, which was broadcast online, about the rape investigation. Father testified that he watched the broadcast and Mother described the rape in "incredibly excruciating detail." She said that she went out drinking with some friends, including Mr. Ramirez, and "[f]elt fuzzy, felt wrong, drunk." Mother said they went back to her home, "and she woke up in the morning with her pants down, and her child in the bed." She stated that she had told her children that a "bad man put a baby in [her] belly." Mother said her children were afraid and asked the following questions:
Who is the bad man? Will he try to hurt you? Will he hurt us? Will he try to take our baby? Mommy, are you going to die because you're not supposed to have any more babies[?] Did the bad man go to jail? Why not?
She included the information about her discussion with the children in an on-line blog about the rape. In addition, she stood on a public street with her baby in a stroller and a sign that read "FREE Donuts! Arrest MY RAPIST." She posted a picture of that activity on Facebook with a caption that said, "I AM THAT GIRL."
[¶9] Mother's crusade was widely publicized with front-page articles in the Casper Star Tribune, a radio report and a televised interview about the rape, in which the children were questioned.[5] She publicly characterized statements about the rape that contradicted her allegations as "bullshit" and said Mr. Ramirez was lying.
• On February 8, 2017, the guardian ad litem (GAL) filed a motion for an order prohibiting Mother from further involving the children in publicity regarding the alleged rape.
• The district court issued a restraining order on February 14, 2017, prohibiting the children from being "referenced, filmed, photographed, interviewed, filmed and/or present during any media, social media or event regarding the [M]other's rape and/or victim advocacy issues."
*818 • In February 2017, the police were called to Mother's house because one of her sons and his friends were smoking marijuana.
• On March 5, 2017, the police were called after Mother confronted Chris Jones, his fiancé and one of the older boys, ZJ, at Applebees. Mother, who was wearing a bathrobe and slippers, was upset because the boy had not come home for dinner. During the encounter, Mother spilled a drink on the fiancé and called her a "whore." Mother told the boy that his "life was going to be hell for acting this way," and the boy began to cry.
• In April 2017, Mother obtained a protection order against Father. She asserted that he stalked her by frequent texts, calls, police welfare checks, peeking in her windows, filming her, and driving by her house. The circuit court granted the protection order. At the time of the evidentiary hearing, Father had appealed the protection order to the district court and Mother claimed he had already violated the order by videotaping her at his house when she came to pick up the girls.[6]
[¶10] At the evidentiary hearing on Father's modification petition, Mother generally claimed the children were not aware of the negative encounters she had with her various romantic partners or law enforcement. Regarding the publicity surrounding her alleged rape, Mother denied there were adverse consequences for the children and said they were "very proud" of her.
[¶11] Father and Mother testified that the girls are smart and happy children, who do well in school and have a good bond with both parents. The counselor generally agreed with the parents' assessment, although she testified that she had diagnosed both girls with adjustment disorder with an emphasis on emotions. There was some testimony that the younger girl, KJ, had trouble making or keeping friends, but the evidence showed that she was not as outgoing as MJ and her best friend had just moved to a different school. The counselor testified the girls were too young to be involved in the rape discussion or to understand it. She also stated that "it would have been very beneficial" for the girls to remain in counseling during the nearly year-long period between Mother's initial refusal to allow counseling and when counseling resumed.
[¶12] The district court provided its ruling at a decision hearing on June 30, 2017. It denied Father's petition for modification, concluding that he had failed to establish a material change of circumstances that affected the children. The court recognized that the stipulated June 5, 2012 modification was the operative document by which it would measure whether there had been a material change in circumstances. It then explained:
... [Father] appeared to agree in May of 2012 when he signed off on the Stipulated Modified Decree of Divorce that any concern he may have raised about [Mother's] mental stability would be addressed in a manner that was acceptable to him by, at least in part, having the children with him more frequently and also in part - more frequently and as described more fully in that Stipulated Modified Decree - and also partially by [Mother] engaging in professional counseling. In other words, it's clear that there was an acknowledgement that some things in [Mother's] life were fragile but that the parties had come to an agreement about how to address that fragility in a manner that was acceptable to both parties and was in the best interest of the children.
Since the entry of that June 5, 2012 Modified Decree, the evidence produced at trial would lead the Court to conclude that [Mother] has had numerous run-ins with the law, that she has struggled with her use of prescription drugs, and that she has struggled with appropriate and controlled consumption of alcohol.
It's also clear that [Mother] has reported to law enforcement in the Casper community that she's a victim of rape and that she has proven herself very open and assertive in public including in the Casper *819 media and in the presence of the Casper City Council at the open public meeting about the incident and the resulted dissatisfaction with Casper's law enforcement community.
The evidence introduced at trial is that [Mother] involved the children in at least some of this public exposure including particularly a televised interview which the testimony would suggest was broadcast statewide.
It's also clear based on the evidence introduced at trial that [Mother] has ignored or refused to honor the parties' right of first refusal. Again, using that term loosely as is more fully defined in the Decree.
And perhaps of most concern to the Court is that [Mother] has become increasingly and openly hostile to and about [Father]. She has also shown questionable decision-making in her approach to parenting her other children, namely, the incident at Applebee's about which there was abundant testimony.
All of those facts taken together, all of those indicia of some instability and some questionable decision-making in [Mother's] life[,] I agree taken together and looked at as a whole constitute a material change in circumstances that might warrant reconsideration of the previous order. The problem is that's not the end of the inquiry.
In the Court's analysis of whether there's a material change in circumstances, ... the Wyoming Supreme Court has been very clear in requiring that the district courts also analyze and make findings regarding whether that material change in circumstances has in some way affected the welfare of the children. In other words, it is not enough for parents seeking modification to just say things have changed. The parent also has to demonstrate that the change holds relevance in the children's lives and that the welfare of the children is affected.
I don't believe that [Father] has met his burden in this regard. The testimony from [Father], from [Mother] and from ... the children's counselor, was that these children are generally well-adjusted, happy, active children who enjoy very much the time they spend with each of their parents and their siblings who are in each of the parents' households.
[The counselor] specifically testified that both [Father] and [Mother] are fit and proper parents, that they can share the responsibilities associated with parenting. The testimony at trial was that overall the girls perform well in school and do not suffer from behavioral problems. While it might be the case that [Mother] has a much less stable home environment than [Father], and it is certainly the case that [Mother] has shown a propensity for a lack of judgment and personal stability, while [Father] appears to have a much better sense of good judgment and stability, the evidence produced at trial led the Court to conclude that it does not have jurisdiction to modify custody or visitation in this matter because particularly at the time of trial there was little to no evidence that the children's welfare was affected by these differences in their parents and relative stability in life. As a result, the Court will deny the petition to modify custody.
[¶13] With regard to Father's motion for order to show cause, the district court concluded that "[Mother] is absolutely in contempt of court for her failure to comply with numerous provisions of the initial Decree and the Amended Decree." The district court stated that she violated the order by failing and refusing to attend counseling with a professional counselor. The court further explained:
I have concluded that [Father] did not meet his burden of showing the children have been affected by the change of circumstances, but it is very clear to me that in the future that the children may be more and more affected by [Mother's] open hostility toward [Father] and [Mother's] overall instability and struggles with good decision-making and that counseling certainly could help address that and could always have helped address that and should have been addressed by counseling starting in June of 2012 when the Court ordered her to engage in counseling.
*820 The court again ordered Mother to participate in professional counseling. The district court entered a written order denying Father's petition, and he filed a timely notice of appeal.
STANDARD OF REVIEW
[¶14] We review the district court's order by applying the abuse of discretion standard of review.
Custody, visitation, child support, and alimony are all committed to the sound discretion of the district court. Scherer v. Scherer, 931 P.2d 251, 253-54 (Wyo.1997) ; Triggs v. Triggs, 920 P.2d 653, 657 (Wyo.1996) ; Basolo v. Basolo, 907 P.2d 348, 352 (Wyo.1995). It has been our consistent principle that in custody matters, the welfare and needs of the children are to be given paramount consideration. Scherer, 931 P.2d at 254 ; Rowan v. Rowan, 786 P.2d 886, 890 (Wyo.1990) ; see also Gurney v. Gurney, 899 P.2d 52, 55 (Wyo.1995) ; and Fink v. Fink, 685 P.2d 34, 36 (Wyo.1984)...."We do not overturn the decision of the trial court unless we are persuaded of an abuse of discretion or the presence of a violation of some legal principle." Fink, 685 P.2d at 36.
A court does not abuse its discretion unless it acts in a manner which exceeds the bounds of reason under the circumstances. Pinther v. Pinther, 888 P.2d 1250, 1252 (Wyo.1995) (quoting Dowdy v. Dowdy, 864 P.2d 439, 440 (Wyo.1993) ). Our review entails evaluation of the sufficiency of the evidence to support the district court's decision, and we afford the prevailing party every favorable inference while omitting any consideration of evidence presented by the unsuccessful party. Triggs, 920 P.2d at 657 ; Cranston v. Cranston, 879 P.2d 345, 351 (Wyo.1994). Findings of fact not supported by the evidence, contrary to the evidence, or against the great weight of the evidence cannot be sustained. Jones v. Jones, 858 P.2d 289, 291 (Wyo.1993). Similarly, an abuse of discretion is present " 'when a material factor deserving significant weight is ignored.' " Triggs, 920 P.2d at 657 (quoting Vanasse v. Ramsay, 847 P.2d 993, 996 (Wyo.1993) ).
Stevens v. Stevens, 2014 WY 23, ¶ 8, 318 P.3d 802, 805-06 (Wyo. 2014) (quoting Bingham v. Bingham, 2007 WY 145, ¶ 10, 167 P.3d 14, 17-18 (Wyo. 2007) ).
Meehan-Greer v. Greer, 2018 WY 39, ¶ 14, 415 P.3d 274, 278-79 (Wyo. 2018).
DISCUSSION
[¶15] Wyo. Stat. Ann. § 20-2-204 (LexisNexis 2017) sets out the statutory requirements for modification of custody and visitation orders:
(a) Either parent may petition to enforce or modify any court order regarding custody and visitation.
....
(c) A court having jurisdiction may modify an order concerning the care, custody and visitation of the children if there is a showing by either parent of a material change in circumstances since the entry of the order in question and that the modification would be in the best interests of the children pursuant to W.S. 20-2-201(a). In any proceeding in which a parent seeks to modify an order concerning child custody or visitation, proof of repeated, unreasonable failure by the custodial parent to allow visitation to the other parent in violation of an order may be considered as evidence of a material change of circumstances.
[¶16] Section 20-2-204(c) mandates a two-step inquiry to determine whether modification of a custody and visitation order is appropriate.
The first step requires a showing that there has been "a material change in circumstances since the entry of the order in question." § 20-2-204(c). Because of the res judicata effect afforded custody orders, such a finding is a threshold requirement. Hertzler v. Hertzler, 908 P.2d 946, 949-50 (Wyo.1995). The district court does not properly acquire jurisdiction to reopen an existing custody order until there has been a showing of "a substantial or material change of circumstances which outweigh society's interest in applying the doctrine of res judicata" to a custody order. Kreuter v. Kreuter, 728 P.2d 1129, 1130 (Wyo.1986). In short, unless the district court finds a *821 material change in circumstances, it cannot proceed to the second step-determining whether a modification would be in the best interests of the child.
Bishop v. Bishop, 2017 WY 130, ¶ 11, 404 P.3d 1170, 1173 (Wyo. 2017) (quoting Hanson v. Belveal, 2012 WY 98, ¶ 18, 280 P.3d 1186, 1193 (Wyo. 2012) ) (some citations omitted). See also , Johnson v. Clifford, 2018 WY 59, ¶ 11, 418 P.3d 819, 823 (Wyo. 2018).
[¶17] The party seeking modification of a custody order must prove a material change of circumstances has occurred since entry of the governing order. Bishop, ¶ 12, 404 P.3d at 1173. The district court evaluates "the current circumstances of the parties in relation to their circumstances at the time the prior custody order was entered." In re TLJ , 2006 WY 28, ¶ 10, 129 P.3d 874, 877 (Wyo. 2006) (citing Jackson v. Jackson, 2004 WY 99, ¶¶ 8-12, 96 P.3d 21, 24-26 (Wyo. 2004) ). See also , Morris v. Morris, 2007 WY 174, ¶ 7, 170 P.3d 86, 89 (Wyo. 2007). In order to be considered material and justify reopening the decree, the change in circumstances must affect the welfare of the children. Hanson, ¶ 34, 280 P.3d at 1197 ; Kappen v. Kappen, 2015 WY 3, ¶ 15, 341 P.3d 377, 382 (Wyo. 2015).
[¶18] The district court concluded that Father had not established a material change in circumstances because, although there was significant evidence of instability in Mother's life and her poor decision-making, "there was little to no evidence that the children's welfare was affected." The court found that "[the] children are generally well-adjusted, happy, active children" who enjoy spending time with each of their parents, perform well in school and do not suffer from behavioral problems. The district court also relied upon the counselor's testimony that Mother and Father are "fit and proper parents."
[¶19] The district court seems to have interpreted our precedent as requiring objective evidence that the children have been adversely affected by a circumstance before a prior custody and/or visitation order may be re-opened. However, we have never said the district court must wait until the children exhibit negative consequences before reconsidering custody and/or visitation. We have said that, in order to be considered material, the change in circumstances must affect the children's welfare, which means that the change "holds some relevance" in the children's life. Kappen, ¶ 15, 341 P.3d at 382. See also , Johnson, ¶ 23, 418 P.3d at 826. A circumstance may have relevance in a child's life before there are outward signs of harm. The district court may take into account the obvious or natural effects of a situation in finding a material change in circumstance.
[¶20] For example, in cases where the custodial parent plans to relocate, we do not require the parent to relocate and the child to show the negative effects of relocation before we will find a material change in circumstances. In Cook v. Moore, 2015 WY 125, 357 P.3d 749 (Wyo. 2015), the father petitioned for a custody modification upon learning that the mother planned to move 1,400 miles away. We listed the following factors for determining whether the planned relocation would be a material change in circumstances:
[A] change in the ability of the parties to maintain the existing parenting agreement, a change in the ability of the children to maintain a close relationship with the remaining parent, factors affecting quality of life in the new location, the child's geographic preference, and the relative merits of available social and educational opportunities in the new location.
Id., ¶ 10, 357 P.3d at 752 (quoting Arnott v. Arnott, 2012 WY 167, ¶ 39, 293 P.3d 440, 458 (Wyo. 2012) ). We approved evaluation of these factors before there was a true test of whether the change would affect the ability of the children to maintain a close relationship with the remaining parent or what the child's quality of life would be at the new location.
[¶21] Another example of where we have recognized a material change in circumstances without a showing of actual adverse consequences to the children is when the noncustodial parent's ability to parent has greatly improved over time while the custodial parent's abilities have remained the same. In Jackson , ¶¶ 1, 8, 96 P.3d at 22, 24, we *822 upheld a change in custody against the mother's challenge that the father had not shown a material change in circumstances. We stated that the district court did not abuse its discretion by concluding the following facts, when taken together, constituted a material change of circumstances:
Mr. Jackson progressed, while Ms. Jackson "maintained." Mr. Jackson had been regularly employed for over 18 months; however, in the course of less than five months, Ms. Jackson switched jobs five times, enrolled in beauty school, quit, and then enrolled in another beauty school, never achieving a stable source of income. Mr. Jackson provided health insurance for the children, which the divorce degree required of him in the event that Ms. Jackson could not. Mr. Jackson also stopped smoking, drinking and chewing, while Ms. Jackson "partied" at least two, sometimes four, times a week. Mr. Jackson married his girlfriend of six months, albeit one week before the modification hearing, and established a household with her and his two children while Ms. Jackson continually relied on her parents for housing and support.
Id., ¶ 11, 96 P.3d at 25. We did not require the father to show that the children had suffered adverse consequences, such as worsening behavior or grades, while they were in the mother's care to justify reopening the custody determination. See also , Thompson v. Thompson, 824 P.2d 557, 559 (Wyo. 1992) ("The evidence is not that the father had slipped backward, but, rather, the mother had surged far ahead in her personal development and ability to serve as a parent.")
[¶22] As the district court recognized, Mother's life was unsettled at the time of the 2012 modification. The order reflected efforts to resolve those issues by having the children spend more time with Father and requiring Mother to engage in professional counseling. The counseling requirement was, obviously, an attempt to address Mother's instability and poor decision-making, which is illustrated by the March 2012 incident where Mr. Lorenzen held Mother and MJ hostage and Father had to rescue the child out of a window.
[¶23] Thus, the district court and Father reasonably expected at the time of the 2012 order that Mother would make efforts to stabilize her life. Yet, Mother did not engage in counseling as ordered, and the district court found her in contempt of court for failing to do so. Instead of addressing her issues in counseling, Mother continued to engage in inappropriate behaviors, including remaining in a tumultuous and violent relationship with Mr. Lorenzen. Mother testified untruthfully at the hearing on this matter that she had ended her relationship with Mr. Lorenzen about a week after the 2012 hostage incident. In fact, the relationship did not finally end until 2013 or 2014 after Mr. Lorenzen shot himself in her presence, she obtained a protection order to prohibit him from harassing her, and she posted on Facebook that she would kill him if he ever came near her or the children again. Mother stated it was "the last straw" and "he couldn't be around us anymore."
[¶24] Mother's position at the hearing was that the children were not affected by the violence that permeated her life because they were not present when it occurred. However, Mother's Facebook post mentioned above indicates that the children had been exposed to Mr. Lorenzen's bad behavior. In addition, it defies credulity to believe the violence, even if not perpetrated in the children's presence, was not relevant to their lives. Mother testified that, on multiple occasions, Mr. Lorenzen "beat the crap" out of her. In at least one instance, she had injuries which would have been visible to the children. The legislature has acknowledged that domestic violence has a negative effect on children. See generally , Wyo. Stat. Ann. § 20-2-201(c) (LexisNexis 2017) ("The court shall consider evidence of spousal abuse or child abuse as being contrary to the best interest of the children.")
[¶25] Mother's other personal relationships also demonstrate her poor decision-making. She feigned a suicide attempt to coerce Mr. Edmonds into showing her love and affection and had a child with Mr. Hernandez, who was not her significant other and had a problem with drugs and alcohol. She let Mr. Hernandez "sleep it off" at her house on multiple occasions but did not believe that *823 had a negative impact on her children because they were not aware of "his issues."
[¶26] As the district court recognized, Mother also had her own problems with alcohol and prescription drugs. Her feigned suicide attempt involved narcotics and she drank to excess on many occasions, some resulting in police involvement. On the day after she was allegedly raped by Mr. Ramirez, Mother posted on Facebook that she could not get out of bed or remember the night before. Mother, herself, stated that one of her children was present in her bed while Mr. Ramirez was there. Mother's use of alcohol and drugs obviously is relevant to the children's lives.
[¶27] The other significant issue in Mother's and the children's lives was the alleged rape. Mother had every right to advocate for herself with the police and/or the city council. However, involving the children in her campaign was not appropriate. The counselor testified that the girls were too young to know about or understand the rape. Mother's own statements about her children's responses when she told them that a bad man had put a baby in her belly demonstrate they were not ready to hear that information. They were understandably fearful for their own safety and the safety of Mother. Furthermore, she exposed them to public scrutiny by allowing them to be featured by media outlets, and the district court had to issue a restraining order prohibiting her from continuing to use them in her public campaign.
[¶28] Mother's questionable decision-making also extended to her care for the girls' emotional and physical wellbeing. Mother took the girls out of counseling after Father enrolled them, and the counselor testified that having counseling during that time would have been very beneficial for them. Mother delayed getting medical attention for KJ's broken leg for two days. While many parents might wait to see if the condition worsened before taking the child for medical treatment, it is disturbing that, on the same day KJ was injured, Mother was at a local bar where she confronted Mr. Ramirez about the rape resulting in the police being called.
[¶29] The district court also found that Mother failed to comply with the right of first refusal in the decree. That provision required the parties to give the other parent the option of taking the girls if childcare was needed. "[P]roof of repeated, unreasonable failure[s] by the custodial parent to allow visitation to the other parent in violation of an order may be considered as evidence of a material change of circumstances." Section 20-2-204(c). See also , Morris , ¶ 13, 170 P.3d at 90-91 (citing Jackson v. Jackson, 961 P.2d 393, 395 (Wyo. 1998) and Russell v. Russell, 948 P.2d 1351, 1354 (Wyo. 1997) ).
[¶30] Finally, Mother testified that the current arrangement for exchanging the girls every day on Father's "off week" is not good for them. She said that she would like the order changed so that she would have the girls with her at the same time she has the boys, with some leeway to accommodate both Father's and her busy schedules. Father also testified it is not good for the girls to change households each day on his "off week." Although Mother stated she wanted to work with Father, the district court commented on Mother's hostility toward Father, indicating that the situation was worsening. The growing animosity between them is clear in the record, manifesting itself in Mother obtaining a stalking protection order against Father shortly before the hearing.
[¶31] In summary, the district court's and Father's understanding after the 2012 modification was that Mother would address the issues which were causing instability in the children's lives through counseling. However, instead of going to counseling as ordered, she continued a violent relationship with Mr. Lorenzen, became involved in other inappropriate relationships, engaged in improper use of drugs and alcohol, and involved the girls in matters which were not appropriate given their young ages. Mother also acknowledged that the current custody/visitation schedule is not working well for the girls.
[¶32] The district court correctly remarked that the evidence shows the girls are generally happy and well-adjusted. As we explained above, our precedent does not require a showing of injury before the court may find a material change of circumstances. Nevertheless, in this record there is evidence *824 that the situation had taken a toll on the girls. The counselor testified she had diagnosed both girls with adjustment disorders with an emphasis on emotions. There was also evidence that the younger girl, KJ, had trouble making or keeping friends. The counselor stated that "it would have been very beneficial" for the girls to remain in counseling during the nearly year-long period when Mother refused to allow them to attend counseling. It is clear Mother's continued instability and poor decision-making, her unwillingness to address the issues through counseling and the parties' inability to make the current custody/visitation arrangement work affect the girls and, therefore, amount to a material change of circumstances. The district court abused its discretion by refusing to reopen the custody and visitation order.
[¶33] We reverse the district court's denial of Father's petition for modification and direct the district court to determine whether modification of the governing custody and visitation order is in the girls' best interests.

W.R.A.P. 7.13(b)(1) states that a guardian ad litem (GAL) may submit a brief "on or before the time specified for the party whom the GAL supports." The GAL filed a brief supporting Father's position. Father's brief was due February 5, 2018, but the GAL did not file her brief until March 6, 2018. Given Father timely filed his brief, there is no basis for dismissal under W.R.A.P. 7.11. However, under W.R.A.P. 1.03, we may take whatever action we deem appropriate. We have disregarded the GAL's brief, and remind counsel that pleadings submitted late may be rejected and/or subject to sanction.

At points, the record in this case is very difficult to follow, especially with regard to the dates on which various events happened. Our review is further hampered by the fact that many of the documents referenced during the evidentiary hearing were not admitted into evidence. In addition, Mother did not file a brief. We have done our best to determine the relevant information and have, throughout this opinion, noted when matters are unclear.

This incident occurred prior to the June 2012 modification order. In general, we do not consider events that happened prior to the controlling order because our focus is on changes in circumstances since entry of that order. See, e.g ., Jensen v. Milatzo-Jensen , 2013 WY 27, ¶ 8, 297 P.3d 768, 772 (Wyo. 2013) ; Bishop v. Bishop, 2017 WY 130, ¶ 12, 404 P.3d 1170, 1173 (Wyo. 2017). However, this incident occurred long after the September 2011 hearing which produced the agreement upon which the June 2012 order was based. Further, this incident provides context for later events.

Mother testified this happened on Labor Day 2013. However, given Mother's explanation, it may have happened around Labor Day 2012, when she was arrested for being an intoxicated pedestrian.

The record indicates that the children may not have been questioned specifically about the rape. Instead, they were apparently asked if they loved their mom and if they were excited to have a new sister.

The district court affirmed the protection order on November 15, 2017, and Father filed a petition for writ of review in this Court. We denied his petition on February 6, 2018.