# IN THE SUPREME COURT, STATE OF WYOMING

## 2023 WY 3

### OCTOBER TERM, A.D. 2022

**January 19, 2023**

LAURA CHRISTINE GARDELS n/k/a
LAURA CHRISTINE BIRT,

Appellant
(Petitioner),

v.

PHILLIP JOSEPH BOWLING,

Appellee
(Respondent).

S-22-0143

*Appeal from the District Court of Laramie County*
The Honorable Catherine R. Rogers, Judge

*Representing Appellant:*
    Tracy L. Zubrod, Zubrod Law Office, P.C., Cheyenne, Wyoming.

*Representing Appellee:*
    M.J. Hall, Lance & Hall LLP, Cheyenne, Wyoming.

*Before FOX, C.J., and KAUTZ, BOOMGAARDEN, GRAY, and FENN, JJ.*

**NOTICE: This opinion is subject to formal revision before publication in Pacific Reporter Third. Readers are requested to notify the Clerk of the Supreme Court, Supreme Court Building, Cheyenne, Wyoming 82002, of typographical or other formal errors so correction may be made before final publication in the permanent volume.**

**KAUTZ, Justice.**

[¶1]     The district court granted Phillip Joseph Bowling's (Father) petition to modify a child custody order which granted Laura Christine Gardels n/k/a Laura Christine Birt (Mother) primary custody of the parties' daughter, HB.  The court's new order establishes shared custody of HB.  Mother claims the district court abused its discretion by finding a material change of circumstances since the original order and by determining shared custody was in HB's best interests.  Finding no abuse of discretion, we affirm.

## ISSUES

[¶2]     The issues for our review are:

1.  Did the district court abuse its discretion by finding a material change in circumstances sufficient to reopen the original custody and visitation order?

2.  Did the district court abuse its discretion by concluding shared custody was in HB's best interests even though the parties were unable to effectively communicate with one another?

3.  Did the district court abuse its discretion by failing to adequately consider HB's sibling relationships in its best interests analysis?

4.  Did the district court abuse its discretion by failing to adequately consider Mother's status as HB's primary caregiver in its best interests analysis?

## FACTS

[¶3]     HB was born in April 2018.  Because Mother and Father were not married and had ended their relationship, they utilized a paternity action to determine their respective parental rights and obligations.  On January 9, 2019, the district court entered an order which established Father's paternity of HB, placed custody of HB with Mother, granted Father visitation, and detailed the parties' obligations to communicate and cooperate with each other regarding many decisions about HB.  The court created a graduated visitation schedule which, as relevant here, gave Father two overnight visits every other week and required the parties to communicate and jointly decide on Father's visitation times.  If the parties were unable to agree, the order specified Monday and Tuesday as Father's default visitation nights and deferred to Mother's parenting decisions.  The Monday and Tuesday nights originally worked for Father because, as a realtor, he often had to work on weekends.  Under the original order, Father was also entitled to 14 total days of summer visitation; however, he could not exercise it for "more than four (4) consecutive days[.]"

1

[¶4]   The parties experienced difficulties implementing the visitation and parenting provisions, and Father filed a petition to modify the order in August 2019.  He claimed the original order had proved unworkable due to ambiguity in its terms governing the parties' exchanges of HB and Mother's attitude toward him.  At the trial on his petition to modify, Father testified that, because his work schedule had become more flexible, he occasionally requested weekend overnight visits with HB rather than the default Monday and Tuesday nights provided in the order, but the "majority of the time it's always a fight."  At the time of trial, HB was nearly three and a half years old and Mother had never permitted Father an entire weekend with her except during his summer visitation.  Mother refused Father weekend visits even when she was working and unable to personally supervise HB.  As a result of Mother's inflexibility with the visitation schedule, HB missed events with Father's family, including birthday and retirement parties, and the opportunity to develop relationships with her cousins on Father's side.  During overnight visitation, Mother insisted on FaceTime calls with HB, even when Father and HB were involved in other activities.  On one occasion, Mother's insistence on daily FaceTime contact resulted in her calling police for a "welfare check," even though Father had informed her by text that HB was busy with her grandparents at a large social event.  Police interrupted the event and interrogated HB.

[¶5]   The original order also required the parties to "consult with each other with respect to . . . medical procedures whenever possible and . . . advise each other at all times of any issues affecting the welfare of the minor child."  Father testified Mother refused to identify HB's dentist and excluded Father from decisions about inoculations, medical check-ups, and treatment of illnesses.  One disagreement between the parties over HB's medical treatment escalated to Mother calling Father an "idiot" and a "sperm donor" in the presence of HB.  Mother also informed Father he "would never be as good of a father as [her new husband]" in front of HB.  At other visitation exchanges, Mother told HB Father was "a mean daddy," HB was "scared" of him, she was "sorry" HB had to go with Father for visitation, and she was "so sorry you [HB] have to be here."  Unsurprisingly, HB demonstrated anxiety around visitation exchanges.

[¶6]   After the trial on Father's petition, the district court found a material change of circumstances had occurred since the original order and it was in HB's best interests for the parties to have "50/50 visitation with HB," which amounted to shared custody.  *See Baer v. Baer,* 2022 WY 165, ¶ 3 n.1, ___ P.3d ___ (Wyo. 2022) (awarding parents equal time with children is properly characterized as joint or shared custody rather than visitation) (citations omitted).  The court adopted a stepped custody schedule to help HB adjust to "spending extended periods of time away from Mother (who has been HB's primary caregiver since birth) . . ., [her] half-sibling (who resides in Mother's home full-time) and [her] step-siblings (who reside in Mother's home part-time)."  Until HB entered kindergarten, the parties would alternate "on a two-week structured (4/3; 3/4) schedule" which granted Mother custody of HB from Sunday at 6 p.m. to Thursday at 6 p.m. one week and from Sunday at 6 p.m. to Wednesday at 6 p.m. the next week.  After HB entered

kindergarten, the parties would have "alternating week-on-week-off [custody] with exchanges to occur each Friday." Mother filed a timely notice of appeal.

## STANDARD OF REVIEW

[¶7] Custody and visitation decisions are committed to the sound discretion of the district court, and we do not overturn those decisions unless the court abused its discretion or violated a legal principle. *Meehan-Greer v. Greer,* 2018 WY 39, ¶ 14, 415 P.3d 274, 278-79 (Wyo. 2018) (citing *Stevens v. Stevens,* 2014 WY 23, ¶ 8, 318 P.3d 802, 805-06 (Wyo. 2014)) (other citations and quotation marks omitted). *See also, Sears v. Sears,* 2021 WY 20, ¶ 13, 479 P.3d 767, 772 (Wyo. 2021). A court abuses its discretion if it acts "in a manner which exceeds the bounds of reason under the circumstances." *Meehan-Greer,* ¶ 14, 415 P.3d at 278-79 (other citations omitted). *See also, Johnson v. Clifford,* 2018 WY 59, ¶ 8, 418 P.3d 819, 822 (Wyo. 2018) ("A district court does not abuse its discretion if it could reasonably conclude as it did."). When our review includes evaluation of the sufficiency of the evidence to support the district court's decision, we give the prevailing party's evidence every favorable inference and omit from consideration any evidence presented by the unsuccessful party. *Meehan-Greer,* ¶ 14, 415 P.3d at 279 (citations omitted). *See also, Taulo-Millar v. Hognason,* 2022 WY 8, ¶ 15, 501 P.3d 1274, 1279 (Wyo. 2022) (citing *Meehan-Greer*). However, "[f]indings of fact not supported by the evidence, contrary to the evidence, or against the great weight of the evidence cannot be sustained." *Meehan-Greer,* 415 P.3d at 279 (citations omitted). A court may also abuse its discretion by ignoring a material factor which deserves significant weight. *Walsh v. Smith,* 2020 WY 25, ¶ 10, 458 P.3d 58, 63 (Wyo. 2020) (citations omitted). We review questions of law de novo. *Kimzey v. Kimzey,* 2020 WY 52, ¶ 64, 461 P.3d 1229, 1246 (Wyo. 2020); *Gjertsen v. Haar,* 2015 WY 56, ¶ 11, 347 P.3d 1117, 1122 (Wyo. 2015).

## DISCUSSION

[¶8] Under Wyo. Stat. Ann. § 20-2-204(c) (LexisNexis 2021), a court can "modify an order concerning the care, custody and visitation of the child[] if there is a showing by either parent of a material change in circumstances since the entry of the order in question and that the modification would be in the best interests of the child[] pursuant to [Wyo. Stat. Ann. §] 20-2-201(a)." Consequently, courts use a two-step analysis when considering a petition for a change in custody or visitation. *Jacobson v. Kidd,* 2018 WY 108, ¶ 16, 426 P.3d 813, 820 (Wyo. 2018). *See also, Jensen v. Milatzo-Jensen,* 2013 WY 27, ¶ 8, 297 P.3d 768, 772 (Wyo. 2013) (citing *In re TLJ,* 2006 WY 28, ¶ 8, 129 P.3d 874, 876 (Wyo. 2006)). "The first step requires proof of a material change in circumstances since the most recent final custody order." *Jacobson,* ¶ 16, 426 P.3d at 820 (citing § 20-2-204(c)). "'Because of the res judicata effect afforded custody orders, such a finding is a threshold requirement. The district court does not properly acquire jurisdiction to reopen an existing custody order until there has been a showing of a substantial or material change of circumstances which outweigh[s] society's interest in applying the doctrine of res judicata

to a custody order.'" *Id.* (quoting *Bishop v. Bishop,* 2017 WY 130, ¶ 11, 404 P.3d 1170, 1173 (Wyo. 2017)) (other citations and quotation marks omitted). After finding a material change of circumstances, the court moves to the second step of the analysis which requires it to determine, based on the totality of the evidence, whether modification of the custody or visitation order would be in the child's best interests. *Gutierrez v. Bradley,* 2021 WY 139, ¶ 23, 500 P.3d 984, 989-90 (Wyo. 2021); *Johnson,* ¶ 11, 418 P.3d at 823; *Bishop,* ¶ 11, 404 P.3d at 1173.

### *Material Change of Circumstances*

[¶9]   Mother claims the district court abused its discretion when it decided a material change of circumstances justified reopening the original custody order. The district court found the circumstances had materially changed because, among other things, Mother interpreted the custody order in a manner which restricted Father's time with HB, "consistently displayed controlling behaviors[,]" and "intrude[d] on Father's limited parenting time" with HB. The court found Mother's actions and the parties' acrimonious relationship caused HB difficulty with transitioning between households and undermined her stability.

[¶10] "A district court's finding concerning a material change in circumstances is principally a factual determination to which we accord great deference." *Meehan-Greer,* ¶ 17, 415 P.3d at 279-80 (citation and other quotation marks omitted). "In order to be considered material and justify reopening the decree, the change in circumstances must affect the welfare of the child[]." *Jacobson,* ¶ 17, 426 P.3d at 821 (citing *Hanson v. Belveal,* 2012 WY 98, ¶ 34, 280 P.3d 1186, 1197 (Wyo. 2012)) (other citation omitted). However, we do not require a party requesting modification to show the child has experienced negative consequences before reopening the custody order. *Id.* The change must simply hold "some relevance in the child['s] life." *Id.* (citation and quotation marks omitted).

[¶11] A custodial parent's controlling behavior and efforts to interfere in the noncustodial parent's relationship with the child can support a finding of a material change of circumstances. *See Bishop,* ¶¶ 13, 19, 404 P.3d at 1174-76 (affirming the district court's finding of a material change in circumstances based upon the custodial father's "controlling behaviors" and efforts to keep the child away from the mother); *Gutierrez,* ¶ 20, 500 P.3d at 989 (the district court properly found a material change of circumstances, in part, because the custodial parent failed to "foster an open relationship" between the children and the noncustodial parent). "A child has a right to have a relationship with both of [her] parents, and when one parent undermines the other parent's relationship with the child, it is contrary to the child's welfare." *Bishop,* ¶ 19, 404 P.3d at 1176 (citing *Russell v. Russell,* 948 P.2d 1351, 1354 (Wyo. 1997), and *Ready v. Ready,* 906 P.2d 382, 385 (Wyo. 1995)).

[¶12] When viewed in accordance with our standard of review, the record contains ample evidence to support the district court's finding that Mother's controlling behavior and interference in Father's relationship with HB was contrary to the original custody order's intent to foster a strong relationship between Father and HB. Mother's insistence upon FaceTime communications with HB during Father's visitation time, regardless of whether Father and HB were otherwise occupied, is just one example of Mother's inappropriate conduct. Mother even called the police to perform a welfare check when Father took HB to a large social gathering with her paternal grandparents despite Father's assurance HB was fine. *C.f., Pahl v. Pahl,* 2004 WY 40, ¶ 19, 87 P.3d 1250, 1256 (Wyo. 2004) (the mother's intrusive actions included insisting upon speaking with the child by telephone twice per day when the child was on a family trip with the father). Mother also excluded Father from HB's medical appointments and decisions about HB's healthcare.

[¶13] Moreover, the original custody order envisioned some level of flexibility between the parents about Father's visitation with HB. Father was entitled to "[t]wo (2) overnight visitations every other week, *as agreed upon by the parties in writing.*" (Emphasis added). The court expected the parties to consult and work together in selecting the overnight visits (which could include weekends). The order established default overnight visitation "on Monday and Tuesday nights" only if the parties could not agree on other days. The evidence showed Mother typically would not consider any alternatives to the default nights. She rarely allowed Father to exercise his visitation at any time other than Mondays and Tuesdays, and she never allowed him to have HB for an entire weekend other than during his summer visitation, even when Mother was working and had to arrange for other childcare. As a result, HB did not have the opportunity to participate in many events involving Father's family. When the parties' actions in implementing the custody order do not meet the court's reasonable expectations, a court may conclude the circumstances have materially changed. *See Jacobson,* ¶¶ 23, 31-32, 426 P.3d at 822-24.

[¶14] The district court also recognized that ambiguity in the original order regarding the visitation pick-up and drop-off times gave Mother the opportunity to interpret the order in a manner which further restricted Father's time with HB. The record supports this finding. The original order did not delineate the time for Father to pick up HB for his two-day visitation every other Monday. Mother unilaterally decided Father could not pick up HB until 3:00 p.m. on Mondays, which significantly limited Father's time with her.

[¶15] The record, when interpreted in a manner favorable to Father, shows the change in circumstances affected HB's welfare. "Stability is of the 'utmost importance to [a] child's well-being.'" *Womack v. Swan,* 2018 WY 27, ¶ 14, 413 P.3d 127, 134 (Wyo. 2018) (citation omitted). *See also, Martin v. Hart,* 2018 WY 123, ¶ 22, 429 P.3d 56, 63 (Wyo. 2018) ("stability in a child's life is of utmost importance") (citations and quotation marks omitted). The district court found HB had difficulty "transitioning between households and dealing with the acrimonious relationship between her parents." Father and his mother (HB's paternal grandmother) testified HB was anxious during exchanges between Mother

and Father. HB had, due to Mother's misconduct, witnessed conflicts between the parents, been the subject of police interrogation during a welfare check, heard Mother say spiteful things about Father, and been encouraged by Mother to fear Father. The district court correctly found the "ongoing hostilities between Mother and Father may compromise HB's stability." The district court properly exercised its discretion when it found a material change in circumstances affecting HB's welfare had occurred since the original order.

### *Best Interests of the Child*

[¶16] Section 20-2-201(a) governs the best interests analysis:

In determining the best interests of the child, the court shall consider, but is not limited to, the following factors:

(i) The quality of the relationship each child has with each parent;

(ii) The ability of each parent to provide adequate care for each child throughout each period of responsibility, including arranging for each child's care by others as needed;

(iii) The relative competency and fitness of each parent;

(iv) Each parent's willingness to accept all responsibilities of parenting, including a willingness to accept care for each child at specified times and to relinquish care to the other parent at specified times;

(v) How the parents and each child can best maintain and strengthen a relationship with each other;

(vi) How the parents and each child interact and communicate with each other and how such interaction and communication may be improved;

(vii) The ability and willingness of each parent to allow the other to provide care without intrusion, respect the other parent's rights and responsibilities, including the right to privacy;

(viii) Geographic distance between the parents' residences;

(ix) The current physical and mental ability of each parent to care for each child;

(x) Any other factors the court deems necessary and relevant.

[¶17]  After considering the factors in § 20-2-201(a), the district court determined a shared custody arrangement would best serve HB's interests.  The court found both parents had a "close, supportive and nurturing relationship" with HB and "demonstrated the ability to care" for her.  Section 20-2-201(a)(i) & (ii).  It determined both parents were competent and fit; however, Mother's inability to set aside her contempt for Father "in a sincere, sustained effort to co-parent" HB affected their communication.  Section 20-2-201(a)(iii) & (vi).  Mother only "grudgingly" relinquished care of HB to Father and struggled with allowing him to parent HB without intrusion.  Section 20-2-201(a)(iv) & (vii).  The court determined Mother appeared "to be mentally unwilling" to get along with Father.  Section 20-2-201(a)(ix).  It was concerned that "Mother's approach to co-parenting [would], over time, erode away at the relationship HB shares with both parents."  Section 20-2-201(a)(v).

### a. **Communication between Parents**

[¶18]  Although Mother does not specifically contest the district court's § 20-2-201(a) findings, she argues the court abused its discretion by concluding shared custody was in HB's best interests while also recognizing the parties had difficulty communicating.  The district court determined Mother was primarily at fault for the parties' communication difficulties.  While she concedes her behavior was inappropriate, Mother argues paradoxically that the parties' communication difficulties favor continuing her primary custody of HB.

[¶19]  Mother is correct that parents' inability to communicate and work with one another to promote their child's best interests may warn against shared custody, while an ability to effectively communicate can support a shared custody order.  *See Bruegman v. Bruegman,* 2018 WY 49, ¶¶ 24-30, 417 P.3d 157, 165-67 (Wyo. 2018) (citing *In re KRA,* 2004 WY 18, ¶ 20, 85 P.3d 432, 439 (Wyo. 2004)).  However, these principles are not immutable.  We concluded the district court properly exercised its discretion in *KRA* when it refused the mother's request for primary custody and found shared custody was appropriate, even though the parties did not get along well.  *KRA,* ¶ 19, 85 P.3d at 438.  The evidence showed that, if the father was not given equal custody and access to the child, the mother could attempt to alienate the child from him.  *Id.*

[¶20]  The district court in this case feared "there [would] never be[] a strong, positive relationship between Mother and Father.  The court [was] concerned that Mother's approach to coparenting [would], over time, erode away at the relationship HB share[d] with both parents because Mother [had] not demonstrated a pattern of supporting

7

development of the relationship between HB and Father."  Like in *KRA,* the district court did not abuse its discretion by deciding, based upon the totality of the evidence, that shared custody would serve HB's best interests by counteracting Mother's efforts to undermine HB's relationship with Father.

[¶21]  Changing courses, Mother also asserts there was no need for the district court to modify the custody provisions of the original order because the trial evidence showed she and Father were improving their communication skills.  Certainly, any efforts the parents make to improve their communication will be a positive development and will promote HB's best interests.  However, the district court was skeptical of Mother's sincerity and believed her efforts to communicate more civilly with Father were prompted by the custody modification litigation.  Because the district court was in the best position to assess the credibility of witnesses and weigh their testimony, we accord considerable deference to its credibility findings.  *Taulo-Millar,* ¶ 15, 501 P.3d at 1279-80 (citing *Johnson*, ¶ 8, 418 P.3d at 822-23) (other citations omitted).  *See also, Paden v. Paden,* 2017 WY 118, ¶ 18, 403 P.3d 135, 141 (Wyo. 2017) (the trial court is better positioned to assess witnesses' credibility and weigh their testimony) (citations omitted).  Mother has not established the district court's conclusion about the genuineness of Mother's efforts to improve her communication with Father was unsupported by the evidence or otherwise unreasonable.  Considering the totality of circumstances of this case, we cannot say the district court abused its discretion by ordering shared custody even though the parties had difficulty communicating.

### b.  Sibling Separation

[¶22] Mother claims the district court abused its discretion by failing to adequately account for the fact HB would be separated from her siblings under the shared custody order.  Mother is married and has a younger son who lives in her home and two older step-daughters who spend part of their time there.  It is undisputed these sibling relationships are important to HB.  Obviously, any change from Mother as primary custodian would affect the amount of time HB spent with her half-brother and step-sisters because the time she spent at Mother's home would be reduced.

[¶23] Separation of siblings is "a non-statutory factor [the district court] also must consider" in determining a child's best interests in custody matters.  *Gutierrez,* ¶ 23, 500 P.3d at 990 (citations omitted).  Public policy favors preserving sibling relationships in custody determinations, regardless of whether the children are full, half, or step siblings.  *Paden,* ¶ 19, 403 P.3d at 141.  *See also, Aragon v. Aragon,* 2005 WY 5, ¶ 26, 104 P.3d 756, 764 (Wyo. 2005) (preservation of sibling relationships is good public policy).  "'[G]enerally speaking[,] the separating of siblings through custody awards . . . is not preferred.  Keeping siblings together in the same household is considered the better practice.'"  *Paden,* ¶ 19, 403 P.3d at 141 (quoting *Aragon,* ¶ 24, 104 P.3d at 763).  If the trial court chooses a custody plan which separates siblings, "the trial court must provide an

8

explanation of its reasoning and place its findings on the record." *Paden*, ¶ 19, 403 P.3d at 141. However, separation of siblings is just one of several factors the district court considers in the best interests analysis, and no single factor is determinative of the custody question. *Id. See also, Aragon*, ¶ 24, 104 P.3d at 763 (emphasis omitted). When step or half siblings with different parents exist, it is inevitable that custody or visitation arrangements will interfere, to some extent, with time the child subject to the order can spend with those siblings. This fact alone, does not necessarily over-ride the interests of the subject child in having a relationship with both of her parents. It is simply a factor for the court to consider in exercising its discretion.

[¶24] The district court adopted the stepped shared custody schedule with the intention of helping HB adjust to spending less time with her siblings. Although Mother did not request special findings of fact and conclusions of law under Wyoming Rule of Civil Procedure (W.R.C.P.) 52(a)(1)(A), she faults the district court for failing to conduct an extensive analysis of the effect of the sibling separation on HB. W.R.C.P. 52(a)(1)(A) ("If one of the parties requests it before the introduction of any evidence, with the view of excepting to the decision of the court upon the questions of law involved in the trial, the court shall state in writing its special findings of fact separately from its conclusions of law[.]"). When the parties do not request Rule 52 findings of fact and conclusions of law and it is clear from the record the district court did not disregard sibling relationships in its best interests analysis, the lack of a detailed explanation of the sibling separation factor is not an abuse of discretion. *See Gutierrez*, ¶¶ 25-26, 500 P.3d at 990 (the district court did not abuse its discretion by providing a "terse analysis regarding the children's sibling relationships" when the parties did not request Rule 52(a)(1)(A) findings and the record clearly showed the court did not disregard the sibling relationships in its best interests analysis). The district court did not abuse its discretion in this case because it accounted for the effect the partial separation of the siblings would have on HB when it crafted the stepped shared custody schedule.

### c. **Primary Caregiver**

[¶25] Mother also asserts the district court, when ordering shared custody, did not sufficiently account for the fact she had been HB's primary caregiver since her birth. Although our precedent shows primary caregiver status may be analyzed as a separate non-statutory best interests factor, it is implicitly included in § 20-2-201(a)(i)'s consideration of the relationship each parent has with the child. *Compare Gutierrez*, ¶ 23, 500 P.3d at 990 (stating "primary caregiver status" is one of the non-statutory factors included in a best interests analysis), *with Bruegman*, ¶ 38, 417 P.3d at 169-70 (determining which parent was the child's primary caregiver in the § 20-2-201(a)(i) analysis). Regardless of how the factor is addressed, we have acknowledged that a change of a child's primary custodian/caregiver is a "weighty matter" that "raises a significant concern about relationship stability and security for the child." *Johnson*, ¶ 12, 418 P.3d at 823 (citing *Gurney v. Gurney*, 899 P.2d 52, 54 (Wyo. 1995)); *Martin*, ¶ 22, 429 P.3d at 64. However,

primary caregiver status is not determinative; it is one of many factors considered in determining the child's best interests. *Pahl,* ¶¶ 13-14, 87 P.3d at 1254-55 (citing *Raymond v. Raymond,* 956 P.2d 329, 332 (Wyo. 1998)). Under the unique facts of a case, other factors may outweigh a party's primary caregiver status. *Id.*

[¶26] While the district court expressly mentioned Mother's primary caregiver status only when it explained the reasons for the stepped shared custody order, the fact she was HB's primary caregiver permeated the district court's decision letter. A child's primary caregiver is "the parent who is primarily responsible for the hands-on, day-to-day care of the child." *Williams v. Williams,* 2016 WY 21, ¶ 21, 368 P.3d 539, 546 (Wyo. 2016), *overruled on other grounds by Bruegman,* 2018 WY 49, 417 P.3d 157 (citations omitted). The district court's recitation of the facts in its decision letter repeatedly referred to Mother as HB's principal custodian, caregiver, and decisionmaker from the time of her birth to the trial. The district court realized Mother's prominent role in HB's life had both positive and negative impacts. Mother's devotion to HB was reflected in their close relationship and her efforts to ensure HB's safety and wellbeing. However, the district court also recognized the way Mother exercised her responsibilities as primary caregiver showed a lack of respect for Father's role in HB's life and Mother's controlling and intrusive behavior towards him was contrary to HB's best interests. *See Bishop,* ¶¶ 19, 21-23, 404 P.3d at 1176-77 (the father's controlling behavior damaged the mother's relationship with the child and weighed against the father retaining custody); *Pahl,* ¶¶ 16-17, 87 P.3d at 1255 (the custodial mother's intrusion upon the father's visitation time showed a reluctance to relinquish care of the child to the other parent under § 20-2-201(a)(iv)). Mother's unwillingness to be flexible with visitation so HB could participate in Father's family's events and Mother's exclusion of him from HB's medical decisions were also contrary to HB's best interests. *See Walsh,* ¶ 16, 458 P.3d at 65 (the mother's refusal to cooperate with the father, including regarding the child's attendance at family events, outweighed the mother's primary caregiver status in determining the child's best interests).

[¶27] The district court was clearly aware of the impact its decision to adopt a shared custody plan which reduced HB's time with Mother would have on HB and structured the schedule to reduce the negative consequences. The court felt that, without a change of custody, Mother would continue to alienate HB from Father which would eventually result in serious damage to HB's relationships with both parents. *See Womack,* ¶ 34, 413 P.3d at 139 (the mother's alienating behavior undermined the quality of the children's relationship with the father). The district court properly exercised its discretion when it concluded other factors outweighed Mother's primary caregiver status in determining HB's best interests.[1]

---

[1] Without articulating specific issues in her appellate brief, Mother complains about other aspects of the district court's shared custody order, including her lack of weekend time with HB, the difficulties she will face in adjusting her work schedule to have more time with HB during her periods of custody, and her inability to take HB to church on Sundays. The court, in exercising its discretion, could have crafted the custody and visitation schedule any number of ways, and some aspects of the schedule are likely to be inconsistent with all that either parent wants. Furthermore, whether we would have, in the first instance,

**CONCLUSION**

[¶28]  The district court did not abuse its discretion by concluding there had been a material change of circumstances affecting HB's welfare since the original custody and visitation order and HB's best interests would be served by granting the parties shared custody.

[¶29]  Affirmed.

---

adopted the same schedule is not the issue.  Mother has not convinced us the court "exceed[ed] the bounds of reason under the circumstances" or otherwise abused its discretion when it decided the way it did. *Meehan-Greer*, ¶ 14, 415 P.3d at 279 (other citations omitted).