OPINION OF THE COURT
Charles J. Tejada, J.
The following is the decision and order of this court. The petition is dismissed and a final order of custody is granted to the respondent mother.
THE PLEADINGS
In this Family Court Act article 6 custody proceeding, the *780 petitioner father seeks modification of a custody order, entered on consent on July 30, 1987, awarding the infant child of the parties to the respondent mother.
The mother denied the allegations (set forth in the father’s petition) and further argues that the motivating factor for the request for a change in custody is the fact that she has tested positive for the human immunodeficiency virus (HIV virus).
FINDINGS OF FACT
Based upon the material, credible and competent evidence and after viewing the witnesses for the petitioner and the respondent, and assessing their credibility, the court makes the following findings of fact.
1. Transfer of custody to the father is not in the best interest of the child.
2. The child has not been exposed to domestic violence by the mother. The mere fact that the mother may have had her boyfriend staying over at her house on weekends does not by itself warrant a modification of a custody order.
3. No evidence was presented that supports the allegation that the respondent is currently abusing controlled substances, that she has done so in the recent past, or that she has jeopardized the welfare of the infant.
4. The mother provides consistent personal care for the child.
5. The child’s medical needs have been provided for by the mother consistently.
6. The child is provided with a happy, clean and loving home environment by the mother.
7. Infection with the HIV virus alone is not grounds for a change in custody. The mother’s HIV positive condition has not significantly impaired nor would it in the near future significantly impair the mother’s ability to care for the infant child, and the child’s physical or psychological well-being is not threatened by the mother’s HIV infection.
DISCUSSION
In the present case, a final order of custody, on consent, was entered on July 30, 1987, granting the mother custody of the infant child. The father now seeks to have this order modified.
It is well established that where a court has awarded custody, such an award should not be disturbed unless "a *781 material change in circumstances is shown.” (Sorrentino v Sorrentino, 122 AD2d 604 [4th Dept 1986].) Moreover, the standard to be applied in determining modification of an existing order remains the best interest of the child under the prevailing circumstances. (Matter of Schwartz v Schwartz, 144 AD2d 857, lv denied 74 NY2d 604 [1989].)
In the present case (however), the father has not sustained his burden of proving the allegation that the child is being exposed to domestic violence, that the respondent is indeed a user of controlled substances and that the mother fails to provide good care for the child.
Contrary to petitioner’s allegation, the evidence presented at trial shows that except for a bronchial asthma condition, the child’s health is good and she suffers from no "developmental problems”. Further, the mother has provided the child with regular and adequate medical care.
Our courts have consistently adhered to the Court of Appeals determination that: "Custody of children should be established on a long-term basis, wherever possible; children should not be shuttled back and forth between divorced parents merely because of changes in marital status, economic circumstances or improvements in moral or psychological adjustment, at least so long as the custodial parent has not been shown to be unfit, or perhaps less fit, to continue as the proper custodian.” (Obey v Degling, 37 NY2d 768, 770 [1975] [emphasis added].)
The petitioner is in a better financial position to provide for the child. However, there is no evidence that the respondent cannot adequately provide for the child’s needs.
Moreover, drastic changes in the life of a young child who is the subject of an acrimonious custody battle can have disastrous effect on that child’s emotional health. Dr. Sullivan, the director of the Brooklyn Family Court Mental Health Clinic, and an expert in child custody litigation, testified that: "The studies that have been done on children of divorce show them to be at risk for various kinds of behavior problems, school performance problems, emotional difficulties such as anger and depression, particularly with the child of a young age. What you have to understand is that a five-year-old child, let’s say, doesn’t look at the world the way adults do. Five-year-old children don’t have the capacity to think logically the way adults do. They have a very egocentric view of the world. They tend to see themselves as the center of the world, and so if *782 their parents are getting divorced and are fighting back and forth, the child may decide that the child’s to blame for this. The child may react to the parental separation by believing that somehow they are unlovable; that’s why one parent has abandoned them. The child may feel guilty over having caused something that’s totally beyond the child’s control, but this is in the nature of how children at this preoperational stage of thinking operate.” The following question and explanation by Dr. Sullivan further describes the emotional risk faced by this child.
"Q. Now, Doctor, supposing I was to say to you that this hypothetical child is going to be removed from a home where she has all the attention of a single parent into another home where there is now a stepmother and there is about to be a half sibling, would that affect how you think the child would react?
"A. Just that change in living circumstances is going to give the child a whole new set of things to deal with. If there are major changes in the child’s daily routine, and the other parent is terminally ill and dies, it’s — it would be like stacking the cards against the child’s abilities to cope. If the child is going to be faced with such a terrible disruption in the child’s life, as a result of a parent’s serious illness or death, I think you would want to minimize the other kinds of changes going on in the child’s life. Even adults have problems coping with additional and new stresses and changes in their routine. For kids of a young age, without an adult’s capacity to respond and think, this is really multiplying problems.”
The subject child of this custody proceeding is part of an acrimonious custody battle. Her mother, who has and is caring for her and with whom she has lived all her life, has a serious illness, and her father has shown no understanding of the child’s emotional needs. Given these factors, this court concluded that this child is at great risk for various kinds of behavioral and emotional problems. Adding the radical disruption of a change in custody to her life would significantly enhance the risk to her emotional well-being.
Although petitioner did not allege that the respondent’s infection with the HIV virus was a changed circumstance warranting modification of custody, it was evident at trial that this fact was of paramount importance. Thus, the court finds it appropriate to address this issue.
There can be no question that the court ought to be con *783 cerned about the welfare of a child whose custodial parent is infected with the HIV virus. However, for modification of custody it must be shown that such a condition in and of itself poses a danger to the child. It would not be in the child’s best interest to be exposed to any person, including a parent who had a highly, that is an easily, contagious disease, nor would it be in her best interest to be left in the sole care of a person who was seriously incapacitated because of an illness or disease.
With respect to how the HIV virus can be contracted, Dr. Abigail Zuger, a staff physician at Montefiore Medical Center, who specializes in the care of patients with HIV and Acquired Immune Deficiency Syndrome (AIDS), testified that there is no evidence that HIV can be contracted through daily household contacts. The following colloquy illustrates.
Direct examination by Ms. Sarkessian:
"Q. Can HIV be contracted through exposure to the tears of an HIV infected person?
"A. That hasn’t been reported.
"Q. Can HIV be contracted through the exposure of saliva of a person infected with HIV?
"A. That has not been reported.
"Q. Can the HIV be contracted through the urine of an HIV infected person?
"A. That has not been reported. * * *
"Q. Do you only work with people who actually have AIDS or do you also work with patients who are just HIV positive?
"A. I work with the whole range, from HIV positive to AIDS.
"Q. In your experience with working with people who are HIV positive or who have AIDS, have you seen a case where a person has contracted a virus through daily household contact with a person infected with HIV?
"A. No.
"Q. Are you aware of any studies that have been done where the HIV virus can be transmitted through daily contact with an HIV infected person?
"A. Yes.
"Q. What do the studies show?
“A. The studies indicate that this transmission has not taken place.
*784 "Q. Are you aware of any reported cases in which a person has contracted HIV virus through household contact with an infected person?
"A. I am aware of no such case. * * *
"Q. Now, if someone drank from the same glass or used the same eating utensils as an HIV infected person can they contract the virus?
"A. That hasn’t been reported.
"Q. How about if somebody shared a toothbrush or the same toilet or bathroom facilities as an HIV person, can they contract the virus?
"A. That hasn’t been reported either. * * *
"Q. Dr. Zuger, is there any way to project a person’s life span after they have contracted the HIV infection?
"A. At this point in time there is really no way to do that.
"Q. Are there any documented cases of people living ten years after they have contracted the HIV infection?
"A. Yes, there are.
"Q. How about 15 years?
"A. Because this is such a new virus, essentially, most of the data stops at ten years. The virus has really only been in the United States for ten years, so 15 years there is no information.
"Q. Based on current medical information available is it possible for someone to contract the HIV infection and never develop AIDS?
"A. Yes, that is possible.”
No evidence was offered to contradict Dr. Zuger’s testimony.
Moreover, the custodial rights of a parent infected by the HIV virus have been addressed in Doe v Roe (139 Misc 2d 209 [Sup Ct, NY County 1988]). In that case the grandparents of two children who were in the custody of their father sought to have him submit to an AIDS test. After reviewing relevant medical literature on the AIDS virus, the court concluded:
"The overwhelming weight and consensus of medical opinion is clear; the HIV virus is not spread casually. Rather, it has specific and well-known modes of transmission, through sexual contact, exposure to infected blood or blood components, and prenatally from mother to infant. (Recommendations for Prevention of HIV Transmissions in Health Care Settings, 36 Morbidity and Mortality Weekly Report 35 [Aug. *785 1987].) A recent summary of HIV infection routes concludes that the three routes discussed above 'still remain the only ones demonstrated to be important’. (Freedland and Kline, Transmission of the Human Immuno Deficiency Virus, 317 New Eng J Med 1125 [Oct. 1987].)”
"Numerous studies have found no risk of HIV infection through close personal contact or sharing of household functions. (See, Curran et al., Epidemiology of HIV Infection and AIDS in United States, 239 Sci 610, 615, n 45 [Feb. 5, 1988]; e.g., Lawrence, HTLV-III/LAV Antibody Status of Spouses and Household Contact Assisting in Home Infusion of Hemophilia Patients, 66 Blood 703, 704-705 [1985].) These studies have figured prominently in decisions by Federal and State courts upholding the rights of HIV-infected children to attend public schools (see, e.g., Ray v School Dist. of Desoto County, 666 F Supp 1524, 1530-1532 [MD Fla 1987]; Thomas v Atascadero Unified School Dist., 662 F Supp 376, 380 [CD Cal 1987]; District 27 Community School Bd. v Board of Educ., 130 Misc 2d 398 [Sup Ct, Queens County 1986]; cf., Jane W. v John W., 137 Misc 2d 24 [Sup Ct, Kings County 1987] [father suffering from AIDS not precluded from visitation with 1 Vi-year-old daughter]).” (Supra, at 219-220.)
It must be noted that in Jane W. v John W. (supra), although the father in that case was diagnosed as having AIDS, the court nonetheless granted visitation pendente lite with the child. The court in that case relied on expert medical testimony that the child would be in no danger of contracting the AIDS virus from the father (Jane W. v John W., 137 Misc 2d, at 25-26, supra).
As to the mother’s physical ability to provide direct care for her daughter, the record clearly establishes that although she has felt weak at times, she has not been incapacitated by her condition and has maintained primary care for her daughter at a high level of performance.
In the present case, even though respondent has been tested positive for the HIV virus, there is no conclusive evidence that she has AIDS or is certain to develop the disease. Indeed, Doctor Zuger testified that persons have been tested positive for the HIV virus without being aifiicted with AIDS and that "an individual can be quite healthy and yet test positive for the virus.”
In addition, the court observes that there was unrebutted testimony that petitioner had sexual intercourse with respon *786 dent after he was informed that she had tested positive for the HIV virus. This sexual activity took place without the use of any safety device. Consequently, the father has been exposed to the risk of contracting the virus. At this point petitioner has tested negative for the HIV virus. However, there is no guarantee that he will not test positive at a future date. As the court in Doe v Roe (139 Misc 2d 209, 213, supra) observed after reviewing available medical literature, "A blood test is, therefore, no guarantee either that the person tested has or does not have AIDS or the HIV antibody.”
CONCLUSION
In the present case it is clear that petitioner failed to sustain his burden of showing that there were changed circumstances that would warrant a change of custody in the best interest of the child. The evidence here compels the court to conclude that the respondent mother is better able to put the child’s needs before her own, and would foster a continued relationship between the petitioner father and the child. It is evident that this young child has a loving relationship with both parents. The voluntary agreement of the parties which gave the mother custody has been in place for some time and clearly there is no evidence supporting a conclusion that changing this arrangement would benefit the child. Further, a change in custody could place the child at a greater risk of developing emotional problems given the facts described above. Consequently, the petition for modification of the custody order, voluntarily entered in 1987, is hereby dismissed.
[Portions of opinion omitted for purposes of publication.]