# IN THE SUPREME COURT, STATE OF WYOMING

## 2022 WY 8

### OCTOBER TERM, A.D. 2021

### January 14, 2022

VANESSA TAULO-MILLAR,

Appellant
(Respondent),

v.

S-21-0056

KORMAKUR HOGNASON,

Appellee
(Petitioner).

*Appeal from the District Court of Albany County*
The Honorable Tori R.A. Kricken, Judge

*Representing Appellant:*
Rennie Phillips, Rennie Phillips Law, LLC, Laramie, Wyoming.

*Representing Appellee:*
No appearance.

*Before FOX, C.J., and DAVIS, KAUTZ, BOOMGAARDEN, and GRAY, JJ.*

**NOTICE: This opinion is subject to formal revision before publication in Pacific Reporter Third. Readers are requested to notify the Clerk of the Supreme Court, Supreme Court Building, Cheyenne, Wyoming 82002, of typographical or other formal errors so correction may be made before final publication in the permanent volume.**

**KAUTZ, Justice.**

[¶1]    Vanessa Taulo-Millar (Mother) and Kormakur Hognason (Father) are the parents of a daughter, FIH.  The district court awarded Father sole custody of FIH, subject to Mother's supervised visitation.  After Father and FIH moved, Father filed a petition to change the location of Mother's supervised visitation.  Mother counterclaimed, requesting her visitation with FIH no longer be supervised.  The court changed the location of Mother's visitation but decided lifting the supervision requirement was not in FIH's best interests.  We conclude the district court did not abuse its discretion or violate Mother's constitutional right to familial association by denying her request to end supervised visitation.

## ISSUES

[¶2]    Mother raises four issues, which we re-state as two:

      1.     Did the district court abuse its discretion when it denied Mother's request to end supervised visitation?

      2.     Did the district court violate Mother's constitutional right to familial association by failing to provide a means by which she can graduate to unsupervised visitation?

## FACTS

[¶3]    Mother is a native of Africa and a naturalized United States citizen.  Father is a native of Iceland and also a naturalized United States citizen.  Mother and Father met while both were graduate students in the school of pharmacy at the University of Wyoming.  At that time, Mother was widowed, suffered from depression, and was HIV positive.  Mother and Father became sexually involved and conceived FIH.  Mother failed to inform Father she was HIV positive before they became intimate.

[¶4]    FIH was born on June 9, 2014, in Colorado.  Mother gave FIH Mother's last name and did not include Father's name on the birth certificate.  Six months later, Mother took FIH to Father's home seeking his help in caring for FIH.  Mother was overwhelmed and emotionally distraught.  When law enforcement arrived, Mother became aggressive and hysterical.  The officers arrested Mother for breach of the peace.  Mother was eventually expelled from the school of pharmacy.

[¶5]    In January 2015, Mother filed a petition to establish paternity, custody, visitation, and support.  Father filed a counterclaim seeking custody of FIH.  The matter proceeded to a bench trial in July 2015.  The court decided it was in FIH's best interests for Mother and Father to share legal custody but for Father to have physical custody of FIH.  *See* Wyo. Stat. Ann. § 20-2-201(a) (LexisNexis 2021).  While it recognized to that point Father had

1

less contact and involvement with FIH, it found Mother was mentally unstable and was more likely to "exclude [FIH] from [Father]'s life than vice versa." The court awarded Mother visitation with FIH the first weekend of each month, from 9:00 a.m. on Saturday to 5:00 p.m. on Sunday. It also allowed Mother to exercise visitation an additional weekend each month so long as she provided timely notice of her intention to do so.

[¶6]   Two weeks later, Father filed a "Motion to Suspend Visitation and Request for Emergency Hearing" because Mother had secured a fraudulent passport for FIH and expressed her intention to take FIH to Africa. The court heard the motion, confiscated the passport, and alerted the relevant federal authorities, who agreed to keep FIH's name in their database in an effort to prevent anyone from attempting to obtain a fraudulent passport for FIH.

[¶7]   Approximately two months later, Casper police arrested Mother for driving under the influence of alcohol (DUI) after she drove her vehicle, with FIH inside, into another vehicle. Mother's blood alcohol concentration was 0.16. A Casper police officer described Mother's behavior at the scene as manic, rapidly alternating between calm and hysterical. When officers asked Mother for Father's contact information, she refused to provide it to them.

[¶8]   Father immediately filed a "Motion to Modify Custody and Visitation and Request for Hearing." The court issued a temporary order requiring Mother's visitation with FIH to be supervised until it could hear Father's motion. It also reduced her twice-per-month visitations to four hours each weekend, two hours on Saturday and two hours on Sunday.

[¶9]   The court heard Father's motion in January 2016. It found the DUI incident alone constituted a material change in circumstances since its previous custody order. However, it also noted the occurrence of several other events in which Mother had demonstrated an inability to co-parent and to place FIH's best interests above her own. Those events included Mother's plan to remove FIH from the United States without Father's knowledge or consent, her securing of a passport for FIH also without Father's knowledge or consent, her bizarre and irrational communications with FIH's daycare providers, her secret recording of her conversations with Father and FIH's doctors, daycare providers and Medicaid workers, her criticism of Father and FIH's hair during a Skype visitation with FIH, her multiple moves between various cities in Wyoming and Colorado, and her unsubstantiated reporting of Father to the Laramie Police Department for stealing her personal belongings and to the Department of Family Services (DFS) for child abuse because FIH had diaper rash.

[¶10]  After weighing the § 20-2-201(a) factors, the court concluded it was no longer in FIH's best interests for Mother and Father to share legal custody and awarded Father sole legal and physical custody of FIH. It also made the temporary visitation order permanent. In so concluding, the court found Father had "risen to the challenge of co-parenting [FIH]"

and had improved his parenting skills. It also found Father was a loving and appropriate parent and adequately cared for and tended to FIH's needs. With respect to Mother's visitation, the court noted Mother had taken steps in the right direction, including starting counseling, taking medications to treat her anxiety and depression, and allegedly ceasing to consume alcohol. Nevertheless, the court found Mother's conduct presented significant safety concerns and FIH was not safe with Mother without supervision.

[¶11] Mother's supervised visitation with FIH initially occurred in Casper, where Father and FIH resided. In 2017, Father and FIH moved to Newcastle and supervised visitation was moved to Gillette. At all times, Mother lived in Golden, Colorado, five to six hours away from Gillette. She either flew to Gillette or rented a car to participate in visitation.

[¶12] In September 2018, Father and FIH, along with Father's new wife, moved to Worland for employment reasons. Father continued to drive FIH three to four hours one-way to attend visitation with Mother in Gillette. During the winter of 2018, Father's vehicle slid off the road twice due to bad weather. In October 2019, Father filed a petition to modify visitation, seeking to move Mother's supervised visitation with FIH from Gillette to Worland. Mother counterclaimed, requesting her visitation with FIH no longer be supervised. After a one-day bench trial, the court concluded Father's move to Worland constituted a material change in circumstances since its previous order. After considering the § 20-2-201(a) factors, the court found it was in FIH's best interests that Father retain custody of FIH, Mother's visitation with FIH be moved to Worland, and Mother's visitation with FIH remain supervised.

[¶13] Mother timely appealed. Father did not file a brief.

## STANDARD OF REVIEW

[¶14] "We 'review orders modifying custody, visitation[,] and child support for an abuse of discretion . . . .'" *Paden v. Paden*, 2017 WY 118, ¶ 6, 403 P.3d 135, 138 (Wyo. 2017) (quoting *Greer v. Greer*, 2017 WY 35, ¶ 19, 391 P.3d 1127, 1133 (Wyo. 2017), and *Tracy v. Tracy*, 2017 WY 17, ¶ 46, 388 P.3d 1257, 1267 (Wyo. 2017)). "Judicial discretion is composed 'of many things, among which are conclusions drawn from objective criteria' and 'means exercising sound judgment with regard to what is right under the circumstances and without doing so arbitrarily and capriciously.'" *Id.* (quoting *Aragon v. Aragon*, 2005 WY 5, ¶ 7, 104 P.3d 756, 759 (Wyo. 2005)). "We 'will not disturb an order regarding custody or visitation so long as the court could reasonably conclude as it did.'" *Id.* (quoting *Greer*, ¶ 19, 391 P.3d at 1133). *See also, Kimzey v. Kimzey*, 2020 WY 52, ¶ 27, 461 P.3d 1229, 1238 (Wyo. 2020) ("'A court does not abuse its discretion unless it acts in a manner which exceeds the bounds of reason under the circumstances.'" (quoting *Jacobson v. Kidd*, 2018 WY 108, ¶ 14, 426 P.3d 813, 820 (Wyo. 2018) (other citations omitted)).

[¶15]   Our review of the reasonableness of a district court's custody and visitation orders "'entails evaluation of the sufficiency of the evidence to support the district court's decision[.]'" *Kimzey*, ¶ 27, 461 P.3d at 1238 (quoting *Jacobson*, ¶ 14, 426 P.3d at 820 (other citations omitted)).   In evaluating the evidence, "[w]e consider the evidence in the light most favorable to the district court's decision, 'affording every favorable inference to the prevailing party and omitting from our consideration the conflicting evidence.'" *Bishop v. Bishop*, 2017 WY 130, ¶ 9, 404 P.3d 1170, 1173 (Wyo. 2017) (quoting *Durfee v. Durfee*, 2009 WY 7, ¶ 6, 199 P.3d 1087, 1089 (Wyo. 2009) (other citation omitted)).   *See also, Paden*, ¶ 6, 403 P.3d at 138 ("'We evaluate the reasonableness of a decision in relation to the evidence presented, viewing it in the light most favorable to the district court's determination, affording every favorable inference to the prevailing party, and ignoring any conflicting evidence.'" (quoting *Greer*, ¶ 19, 391 P.3d at 1133)).   "'Deference must be given to the opportunity of the trial court to judge the credibility of the witnesses, and a reviewing court will not set aside the court's findings merely because it might have reached a different result.   The trial judge is in the best position to assess the credibility of witnesses and weigh their testimony, and, thus, this Court accords considerable deference to the trial judge's findings.'" *Johnson v. Clifford*, 2018 WY 59, ¶ 8, 418 P.3d 819, 822-23 (Wyo. 2018) (quoting *Drake v. McCulloh*, 2002 WY 50, ¶ 18, 43 P.3d 578, 584 (Wyo. 2002)).   "The burden is on the party asserting an abuse of discretion to establish such an abuse." *Aragon*, ¶ 21, 104 P.3d at 762 (citing *Person v. State*, 2004 WY 149, ¶ 11, 100 P.3d 1270, 1275 (Wyo. 2004)).

[¶16]   "Determination of whether the doctrine of res judicata applies is a question of law, which we review de novo." *Womack v. Swan*, 2018 WY 27, ¶ 17, 413 P.3d 127, 135 (Wyo. 2018) (citing *Platt v. Platt*, 2014 WY 142, ¶ 27, 337 P.3d 431, 439 (Wyo. 2014)).   We also review de novo whether a district court's order violates constitutional rights, including the right to familial association.  *Tracy*, ¶ 49, 388 P.3d at 1267-68 (citing *Arnott v. Arnott*, 2012 WY 167, ¶ 11, 293 P.3d 440, 444 (Wyo. 2012)).

## DISCUSSION

### A.      *Did the district court abuse its discretion when it denied Mother's request to end supervised visitation?*

[¶17]

> We employ a two-step analysis in determining a request for a change in custody or visitation. *Jensen v. Milatzo-Jensen*, 2013 WY 27, ¶ 8, 297 P.3d 768, 772 (Wyo. 2013) (citing *In re TLJ*, 2006 WY 28, ¶ 8, 129 P.3d 874, 876 (Wyo. 2006)). The first step requires a showing of a material change in

4

circumstances since the most recent custody and/or visitation order. *Id.*; *Meehan-Greer [v. Greer]*, [2018 WY 39,] ¶ 17, 415 P.3d [274,] 279-80 [(Wyo. 2018)]. Once that is shown, the court determines whether a change of custody and/or visitation is in the children's best interests. *Jensen*, ¶ 8, 297 P.3d at 772; *Meehan-Greer*, ¶ 25, 415 P.3d at 281.

*Kidd v. Jacobson*, 2020 WY 64, ¶ 14, 463 P.3d 795, 798-99 (Wyo. 2020). *See also*, Wyo. Stat. Ann. § 20-2-204(c) (LexisNexis 2021).

### *1.      Material Change in Circumstances*

[¶18] Res judicata prohibits a district court from modifying a previous custody or visitation order absent a "material change in circumstances." *Bishop*, ¶ 11, 404 P.3d at 1173 (quoting *Hanson v. Belveal*, 2012 WY 98, ¶ 18, 280 P.3d 1186, 1193 (Wyo. 2012), and *Kreuter v. Kreuter*, 728 P.2d 1129, 1130 (Wyo. 1986)). *See also, Kimzey*, ¶ 29, 461 P.3d at 1238 ("Because of the res judicata effect afforded custody orders, a finding of a material change of circumstances since entry of the decree is a threshold requirement." (italics and citations omitted)). "'[T]o be considered material and justify reopening the [order], the change in circumstances must affect the welfare of the children.'" *Kimzey*, ¶ 29, 461 P.3d at 1238 (quoting *Jacobson*, ¶ 17, 426 P.3d at 821). "'A district court's finding concerning a material change in circumstances is principally a factual determination to which we accord great deference.'" *Ianelli v. Camino*, 2019 WY 67, ¶ 23, 444 P.3d 61, 67 (Wyo. 2019) (quoting *Meehan-Greer,* ¶ 17, 415 P.3d at 279-80).

[¶19]  Father argued his move to Worland constituted a material change in circumstances justifying reconsideration of the existing visitation order. Mother maintained her increased mental wellbeing and sobriety also constituted a material change in circumstances. The district court determined Father's relocation to Worland constituted a material change in circumstances, but Mother's alleged improved mental health and sobriety did not. Although Mother testified regarding her improved mental health, the court found her testimony was not credible or corroborated by any counselors or therapists. As a result, the court had "no sense of what [Mother]'s mental health actually is and whether the counselor[s] would agree with her unilateral decision to discontinue medications for her mental health."

[¶20] The court's finding that Father's relocation constituted a material change in circumstances allowed the court to reopen the entire visitation order, including its supervision requirement, and to decide what modification, if any, was in FIH's best interests. *Booth v. Booth*, 2019 WY 5, ¶ 21, 432 P.3d 902, 909 (Wyo. 2019) ("Once the issue of custody or visitation is reopened by a finding of material change in circumstances, the court is required to make an independent determination about what, if any, modification is in the children's best interest." (citing *Forbes v. Forbes*, 672 P.2d 428, 429 (Wyo. 1983)

(other citation omitted)). *See also, Arnott*, ¶ 40, 293 P.3d at 458 (recognizing "a relocation by the primary physical custodian, as well as factors that are derivative of the relocation—including the inherent difficulties that the increase in geographical distance between parents imposes—may constitute a material change in circumstances sufficient to warrant consideration of the best interests of the children" (internal quotations omitted)). In doing so, the court was permitted to consider "all factors that affect the best interests of [FIH], and [was] not limited to the factors identified by the parties." *Booth*, ¶ 21, 432 P.3d at 909. *See also, Ianelli*, ¶¶ 25-26, 444 P.3d at 67-68 (rejecting Mother's argument that the district court could only modify visitation, not custody, because her relocation only constituted a material change in circumstances with respect to visitation; "if a material change exists, as it does here, the district court may properly review both custody and visitation issues to determine whether modification of the original order is warranted[]").

### 2. Best Interests

[¶21] To determine the best interests of a child, a court must consider the following factors:

(i)  The quality of the relationship each child has with each parent;

(ii)  The ability of each parent to provide adequate care for each child throughout each period of responsibility, including arranging for each child's care by others as needed;

(iii)  The relative competency and fitness of each parent;

(iv)  Each parent's willingness to accept all responsibilities of parenting, including a willingness to accept care for each child at specified times and to relinquish care to the other parent at specified times;

(v)  How the parents and each child can best maintain and strengthen a relationship with each other;

(vi)  How the parents and each child interact and communicate with each other and how such interaction and communication may be improved;

(vii)  The ability and willingness of each parent to allow the other to provide care without intrusion, respect the other parent's rights and responsibilities, including the right to

6

privacy;

> (viii) Geographic distance between the parents' residences;

> (ix) The current physical and mental ability of each parent to care for each child;

> (x) Any other factors the court deems necessary and relevant.

Section 20-2-201(a). "'No single factor is determinative,' and 'depending on the case, different factors will present a greater need for emphasis. The one constant is that the resolution must be in the [child's] best interests[.]'" *Martin v. Hart*, 2018 WY 123, ¶ 21, 429 P.3d 56, 63 (Wyo. 2018) (quoting *Stevens v. Stevens*, 2014 WY 23, ¶ 26, 318 P.3d 802, 811 (Wyo. 2014)).

[¶22] The district court considered each of the statutory factors. It found FIH had a strong relationship with Mother and Father and both communicated well with her. Section 20-2-201(a)(i), (vi). While the court had reservations about the parties' ability to strengthen their relationship and the geographic distance between them, it was nevertheless hopeful they would continue to communicate politely in arranging travel and visitation and noted they had not lived within a five-hour drive of one another in several years. Section 20-2-201(a)(v), (viii). With respect to the remaining statutory factors, the court found:

- The court had "concerns" about Mother's ability to adequately care for FIH given (1) Mother was still living in a residence owned by her friend, Laura Taylor, and her relationship with Ms. Taylor was "fraught with instability and issues," (2) Mother was "still working part-time as a home care provider and still [had] not become certified as a pharmacy technician," and (3) Mother's "troubling" behaviors at visitations, including her decision to discontinue her HIV medication for lengthy periods of time, which resulted in her being contagious. Section 20-2-201(a)(ii).

- The court had "doubts" about Mother's competency and fitness given (1) her tendency to arrive at visitation with lavish gifts for FIH, including providing her extreme amounts of undergarments, (2) her bathing of FIH in the sink at every visitation in front of others and in view of cameras (bathing ritual), and (3) her decision, without the recommendation of her physician, to discontinue her HIV medication to "give her body a break." Section 20-2-201(a)(iii).

7

- The court had "grave concerns" regarding Mother's willingness to relinquish care of FIH to Father should Mother be allowed unsupervised visitation given that she had previously obtained a fraudulent passport for FIH and had intended to abscond with her to Africa. While Mother denied having obtained another fraudulent passport for FIH, "her tone and demeanor led the [c]ourt to suspect that she may, in fact, have another passport for [FIH] and may have plans, once again, to abscond with her daughter[.]" Section 20-2-201(a)(iv).

- The court heard "lengthy testimony" that Mother felt Father was unable to provide adequate care to FIH because FIH is half-African and her hair and skin require special care. Mother "seemed convinced that she, and she alone, could understand the needs of her daughter and testified that she, during supervised visitation, taught six-year-old, potty-trained, FIH how to properly use the bathroom." Mother "also appeared convinced that her bathing ritual was necessary to teach [FIH] how to properly wash herself," even though the evidence showed FIH had no issues with hygiene or grooming. Section 20-2-201(a)(vii).

- The court was "concerned" about Mother's mental, emotional, and physical ability to care for FIH given the totality of the evidence, including Mother's "questionable and self-serving testimony regarding her own mental wellbeing, as well as her inconsistent care for her HIV status." Section 20-2-201(a)(ix).

- The court "ha[d] concerns" regarding Mother's ability to participate in unsupervised visitation "considering the history of this matter and [Mother]'s repeated incredible testimony at both the prior hearings and this hearing." Of "gravest concern" to the court were (1) Mother's "prior, and possibly current, plans to flee the country" with FIH, (2) her "evasive . . . testimony regarding her finances and how she is able to afford twice-monthly plane tickets from Denver to Gillette [and] extravagant gifts for [FIH] when she is currently on track to make around $10,000 this calendar year (despite her testimony that she works up to forty-six hours per week at a rate of around $14.00/hour)," and (3) statements made on social media by Mother's family in Africa "about meeting [FIH] soon and [FIH] visiting them in Africa." Altogether, the court found "the picture painted by [Mother] just doesn't make sense." Section 20-2-201(a)(x).

The court also found "[o]ther than [Mother]'s insistence on performing the bathing ritual, [it] heard no evidence of abuse on the part of either party." *See* § 20-2-201(c) ("The court shall consider evidence of spousal abuse or child abuse as being contrary to the best interest of the children. If the court finds that family violence has occurred, the court shall make

8

arrangements for visitation that best protects the children and the abused spouse from further harm."). After weighing these factors, the court determined "it is in the best interests of [FIH] that visitation remain supervised . . . ."

[¶23] Mother argues the district court abused its discretion in deciding supervised visitation remained in FIH's best interests because its decision (1) was not supported by the evidence; (2) was improperly based on the court's bias against Mother; and (3) involved consideration of issues previously litigated in violation of res judicata. We address Mother's first and second arguments together.

### a. Sufficiency of the Evidence/Bias

[¶24] Mother contends the district court's concerns about her mental health, the bathing ritual, her gift-giving, her being HIV positive, the possibility she will abscond with FIH, and her living situation are not supported by the evidence. She also maintains the court was biased against her.

[¶25] Mother's arguments are based on her version of the evidence, which is contrary to our standard of review. Our standard of review requires us to consider the evidence in the light most favorable to the district court's decision and to ignore conflicting evidence. *Bishop*, ¶ 9, 404 P.3d at 1173; *Paden*, ¶ 6, 403 P.3d at 138. When properly viewed in this light, there is more than sufficient evidence supporting the district court's decision that lifting the supervision requirement was not in FIH's best interests. Because the court's decision was based on the evidence, Mother has failed to show the court was biased against her.

[¶26] Mother argues that since the court ordered supervised visitation in January 2016, she has addressed the issues leading to her depression, met regularly with the same counselor and psychiatrist, learned coping strategies, and voluntarily participated in outpatient treatment for alcohol abuse even though she has never been diagnosed as an addict or abuser. Mother testified to these facts and claimed she had not taken any psychotropic medication since 2019 due to her progress. However, as we explained above, the court found this testimony was not credible. We defer to this credibility determination. *Johnson*, ¶ 8, 418 P.3d at 822-23. The court also found Mother's testimony was not corroborated by any counselors or therapists and therefore it "ha[d] no sense of what [Mother]'s mental health actually is and whether the counselor[]s would agree with her unilateral decision to discontinue medications for her mental health."

[¶27] Mother claims Father's Exhibit G supports her mental health testimony. She complains the district court referred to Exhibit G as a mere "summary" of her mental health records, when, she contends, it is actually "over 260 pages of every appointment [Mother] has had with the same [mental health] providers." Mother misstates the court's characterization of Exhibit G. It did not say it was only a "summary" of her mental health

9

records. Rather, the court correctly stated Exhibit G consisted of "counseling summaries" from Mother's sessions with her therapist and visits with her psychiatrist "wherein [Mother] discussed primarily her frustration with previous custody, visitation, and child support proceedings." Even Mother's own attorney objected to Father's use of Exhibit G because it consisted only of her counselor's and psychiatrist's notes, which she contended were hearsay. The district court "noted" the objection and stated the medical records would be "considered for proper purposes only." However, at the close of his evidence, Father moved for the admission of Exhibit G and the court admitted Exhibit G into evidence without an objection from Mother. The district court reasonably concluded this evidence did not establish that Mother's mental health had improved enough that unsupervised visitation would be in FIH's best interests. While Mother could have called witnesses to offer opinions about her improvement, if any, she did not.

[¶28] Mother maintains the evidence showed she bathed FIH and applied lotion to her skin at visitations to show FIH how to properly care for her unique hair and skin and because FIH had complained her skin was itchy. She also claimed it was a mother-daughter bonding experience. Based on this evidence, Mother argues the district court was simply wrong when it found she "was unable to offer any plausible justification for why [the bathing] ritual was necessary or beneficial to [FIH]." She also claims it was inappropriate for the court to equate the bathing ritual to child abuse, especially since the court had never observed it.

[¶29] The evidence showed the bathing ritual consisted of Mother completely undressing FIH, placing her on the counter in the kitchen area of the visitation room, and bathing her in the sink. It occurred at every visitation, on camera, and in view of others. While Mother testified the bathing ritual was necessary to show FIH how to properly care for her unique skin and hair, the evidence showed Mother insisted on performing the ritual at every visitation even though FIH was six-years-old, knew how to bathe herself, arrived at visitations clean and properly groomed, and each visitation lasted a mere two hours.

[¶30] Tiffany Dailey, one of the visitation supervisors, testified the bathing ritual was allowed during visitations because it was viewed as a bonding experience between Mother and FIH and FIH never refused to participate or acted uncomfortable. She also testified the visitation team did not feel Mother's visitation needed to be supervised. However, Father testified that when he first learned of the bathing ritual in the summer of 2020, he confronted the visitation supervisors and Mother. In response, the supervisors discussed with Mother whether the ritual was appropriate given FIH's age and requested Mother put FIH in a bathing suit prior to bathing her in the sink. Based on these actions, the supervisors obviously recognized the inappropriateness of Mother undressing and bathing six-year-old FIH in a sink in view of others and cameras. Moreover, Ms. Dailey admitted there are other forms of parental bonding which did not require Mother "stripping [FIH] down and bathing her in the sink."

[¶31]   The district court did not personally observe the bathing ritual, but it did view screenshots of videos of Mother performing the bathing ritual.  Because Mother did not designate those screenshots as part of the record on appeal, we assume they supported the district court's characterization of the bathing ritual.  *Cf. Sears v. Sears*, 2021 WY 20, ¶ 19, 479 P.3d 767, 774 (Wyo. 2021) (assuming the evidence supported the district court's findings related to its joint custody decision because Mother failed to designate the trial transcript).  Similarly, although Mother offered reasons for performing the bathing ritual, the court did not find them to be "plausible."  Again, this credibility finding is entitled to deference, and we cannot say it is unreasonable given FIH's age, her ability to bathe herself, her arrival at visitations clean and well-groomed, and the short duration of the visitations.

[¶32]   Mother argues the court's concerns with her gift-giving were not supported by the evidence because her giving gifts to FIH caused no imminent danger to FIH or otherwise compromised her safety, was consistent with rules of the visitation facility, and was not unreasonable given she does not get to spend holidays or birthdays with FIH.  She also maintains buying clothes for FIH when they are on sale and wanting to see her in them are normal things mothers do for their children.

[¶33]   Father described Mother's gift-giving as giving FIH "two birthday parties a month." While he acknowledged Mother's "excessive gift giving [was] obviously of great joy to [FIH]," he also testified FIH had said, "I love my mom because she gives me a lot of presents."  He did not believe that type of bonding was in FIH's best interests.  Moreover, Mother's gift-giving involved not only toys but also fifty pairs of underwear in a year and a half.  Yet, the evidence showed Mother often kept FIH's worn underwear. Father testified Mother changes FIH into different clothes at the beginning of each visitation, including different underwear, and typically places her back in the clothes she arrived in at the end of each visitation.  However, for a period of time, FIH would come home from visitations in different underwear than she left home in because Mother kept the underwear.  As the district court found, Mother provided no explanation for this behavior.

[¶34]   Mother says the court's concerns about her being HIV positive are not supported by the evidence.  She asserts she has the authority to make decisions about her HIV therapy and there are times when she chooses to "adjust" her medication to cleanse her body.  She also complains the court gave no weight to her testimony concerning her efforts to ensure FIH's safety, including that she followed all protocols while pregnant to ensure FIH was born HIV negative.

[¶35]   The evidence showed Mother's infectious disease doctor had instructed her to take her HIV medication daily.  Mother admitted the medication is important so HIV is not detectable in her system.  She also admitted that if HIV is detectable in her system, she can transmit it to others.  Contrary to Mother's argument on appeal, she did not merely "adjust[]" her medication.  She stopped taking it for three months in late 2019/early 2020 to "give [her]self a break."  She admitted she "did not ask for permission from [her] doctor

11

not to take the medication. That was [her] personal decision based on what [she] needed to do for [her] body . . . ." As a result of her not taking her medication, HIV was present in her system in March 2020.

[¶36] Mother points to cases from other jurisdictions where courts have found the fact a parent is HIV positive does not warrant a modification in custody or visitation because the medical evidence shows HIV is not transmitted through casual contact between a parent and child. *See Stewart v. Stewart*, 521 N.E.2d 956, 964 (Ind. App. 4 Dist. 1988) ("An examination of the evidence leads to but one conclusion: the medical evidence and studies available at the time of trial showed that AIDS is not transmitted through everyday household contact."); *Newton v. Riley*, 899 S.W.2d 509, 510 (1995) ("The widely accepted conclusion among medical researchers is that there exists [n]o risk of HIV infection through close personal contact or sharing of household functions.") (citations and internal quotations omitted); *Matter of Steven L v. Dawn J*, 561 N.Y.S.2d 322, 324-25 (1990) (same). Those cases are distinguishable. They did not involve an HIV positive parent choosing to discontinue prescribed medication. *Id.* The issue in this case was not as much whether Mother created a risk of infecting others through everyday household contact but rather whether Mother recognized the importance of compliance with prescribed medical treatment. Moreover, the evidence in the cited cases included expert testimony consistent with the medical research. *Id.* No such expert testimony was presented in this case. Rather, Mother testified that if HIV is detectible in her system, she can transmit it to others.

[¶37] Mother's choice to discontinue her HIV medication against medical advice supports an inference that Mother places her personal interests above those of others, including her daughter. FIH certainly has an interest in Mother remaining as healthy as possible by complying with medical advice. This evidence supports the district court's conclusion that supervised visitation was in FIH's best interests.

[¶38] Mother maintains there is no risk of her absconding with FIH to Africa because she does not have a passport and cannot obtain one because she owes child support. However, the evidence showed Mother had told FIH at visitation "how much she wished she could take [FIH] with her to Africa to show her the country that she comes from." Father testified these statements were concerning given Mother's previous intent to abscond with FIH. There was also evidence that Mother's family had made statements on social media about meeting FIH soon and FIH visiting them in Africa. Although Mother denied she had obtained another passport for FIH, the court found her not to be credible.

[¶39] Mother complains this credibility determination was subjective because there was no evidence she had applied for another passport and the federal authorities would have alerted Father had she done so. She also claims "the court cannot keep custody [of] FIH [from her] forever solely because she may, someday, wish to take a trip to Africa with FIH. Parents are allowed to travel with their children." Parents are not, however, allowed to illegally abscond with their children. Moreover, the fact that Mother had previously

12

obtained a passport and intended to flee with FIH to Africa was relevant to Mother's willingness to relinquish care of FIH to Father should Mother be allowed unsupervised visitation. There are numerous ways Mother could abduct FIH without obtaining a passport. As Father aptly testified, he trusted that the supervision component of Mother's visitation "was strong enough that [the] nightmare of [FIH] being abducted would not occur."

[¶40] Mother argues the evidence showed her living situation was stable. She faults the court for relying on her counseling records to support its finding that her living situation was not stable while discounting those same records for purposes of assessing her mental health.

[¶41] Mother admitted she told her counselor in December 2016 that she felt like she had "overstayed" her welcome at her friend's (Ms. Taylor) house but could not afford to move so she had asked her employer for live-in home-care positions "to stay out of the way." She also admitted she told her counselor in February 2017 she chooses live-in jobs so she can avoid staying at Ms. Taylor's house. Even if Mother and Ms. Taylor's relationship had improved as Mother testified, the evidence was clear Ms. Taylor had discretion to determine Mother's living situation because she owned the home.

[¶42] Finally, Mother challenges various statements and findings in the district court's order which she claims show the court was biased against her. She faults the court for (1) referring numerous times to her past untruthfulness, thereby demonstrating it did not impartially evaluate her current situation; (2) emphasizing that she works as an "uncertified" pharmacy technician even though the evidence showed she had to postpone taking the certification examination due to the COVID-19 pandemic and certification would not change her job duties or substantially change her pay; (3) finding Mother "testified that she, during supervised visitation, taught six-year-old, potty-trained, [FIH] how to properly use the bathroom," when she actually testified she taught FIH how to use the bathroom when she complained her private parts hurt when she needed to urinate; and (4) failing to "recognize *any* [of Father's shortcomings] . . . while discrediting virtually *everything* submitted by [Mother]."

[¶43] "An accusation that a judge is biased is a serious claim." *Guy-Thomas v. Thomas*, 2015 WY 35, ¶ 8 n.4, 344 P.3d 782, 785 n.4 (Wyo. 2015). "We have defined bias and prejudice as follows: 'Prejudice involves a prejudgment or forming of an opinion without sufficient knowledge or examination. Bias is a leaning of the mind or an inclination toward one person over another.'" *Metz v. Metz*, 2003 WY 3, ¶ 20, 61 P.3d 383, 389 (Wyo. 2003) (quoting *Cline v. Sawyer*, 600 P.2d 725, 729 (Wyo. 1979)). "[T]he party alleging a claim of bias or prejudice must present specific facts showing prejudgment or a leaning of the mind to the extent that the district court's decision was *based on grounds other than the evidence before it*"; "[m]ere allegations will not suffice to show bias or prejudice[.]" *Steiger v. Happy Valley Homeowners Ass'n*, 2010 WY 158, ¶ 35, 245 P.3d 269, 279 (Wyo.

2010) (emphasis added) (citing *Reichert v. State*, 2006 WY 62, ¶ 37, 134 P.3d 268, 278 (Wyo. 2006), and *TZ Land & Cattle Co. v. Condict*, 795 P.2d 1204, 1211 (Wyo. 1990)). Moreover, "the mere fact of restricted visitation does not necessarily indicate motive to punish or bias. *Brown v. Avery*, 850 P.2d 612, 616 (Wyo. 1993). Rather, our threshold inquiry remains whether the evidence presented fairly supports the decision of the district court." *Basolo v. Basolo*, 907 P.2d 348, 353 (Wyo. 1995). *See also, DeLoge v. State*, 2007 WY 71, ¶ 12, 156 P.3d 1004, 1008 (Wyo. 2007) ("To demonstrate judicial bias, or prejudice, an appellant must show more than the fact that the trial court ruled against him, correctly or incorrectly, on a particular matter.").

[¶44] Each of Mother's allegations of bias relates to the district court's weighing of the evidence and credibility determinations. Her claims are all based upon her interpretation of the evidence, which is contrary to our standard of review. For example, the court accurately stated Mother was not certified as a pharmacy technician and its emphasis of this fact was simply a recognition of Mother's failure to become certified even though the evidence showed she had talked to her counselor about taking the certification exam in October 2018, March 2019, and August 2019—prior to the COVID-19 pandemic. As we demonstrated above, the district court's decision is sufficiently supported by the evidence when properly viewed under our standard of review. Given the evidence, the court was reasonably concerned about Mother's mental and physical ability to adequately care for FIH, her competency and fitness, and her willingness to allow Father to provide care for FIH without intrusion and to relinquish care to him if she was allowed unsupervised visitation with FIH. In other words, the evidence showed the factors which necessitated supervised visitation in the first place had not changed. Because Mother has failed to show the court based its decision on grounds other than the evidence in the case, she has not established the court was biased against her.

### b.    *Res Judicata*

[¶45] Mother argues the district court was barred by res judicata from relying on her being HIV positive and the possibility of her absconding with FIH in deciding supervised visitation remained in FIH's best interests. She claims the fact that she is HIV positive was previously litigated at the original custody trial, yet the court did not order supervised visitation at that time. She claims there was no new evidence since the initial custody trial showing she posed an actual safety risk to FIH. Similarly, Mother asserts the possibility of her absconding with FIH was addressed after the first custody trial and resolved when the court confiscated the fraudulent passport and alerted federal authorities. She says the only new evidence since that time of her being a flight risk is that on "one or two occasions" she talked with FIH "about how much she wishes she could take [FIH] to Africa to show her the country that she comes from." According to Mother, two conversations within five years is not new evidence of an intent to abscond with FIH.

Res judicata bars litigation of issues that were or could have been determined in a prior proceeding. *Tozzi v. Moffett*, 2018 WY 133, ¶ 16, 430 P.3d 754, 760 (Wyo. 2018). "[It] generally prevents parties from presenting the same claim in subsequent actions once that claim has been adjudicated." *Rigdon v. Rigdon*, 2018 WY 78, ¶ 12, 421 P.3d 1069, 1073 (Wyo. 2018). We examine four factors to determine if res judicata bars a claim: (1) is there identity of parties; (2) is there identity of subject matter; (3) are the issues the same and do they relate to the subject matter; and (4) are the capacities of the persons identical in reference to both the subject matter and the issues between them. *Rigdon*, ¶ 13, 421 P.3d at 1073.

*Motylewski v. Motylewski*, 2021 WY 51, ¶ 12, 484 P.3d 560, 562 (Wyo. 2021). "The purposes of the res judicata doctrine are to promote judicial economy and finality, prevent repetitive litigation, prevent inconsistent results, and increase certainty in judgments." *McBride-Kramer v. Kramer*, 2019 WY 10, ¶ 23, 433 P.3d 529, 535 (Wyo. 2019) (citing 46 Am. Jur. 2d Judgments § 444 (Nov. 2018 Update)). *See also, Arnott*, ¶ 13, 293 P.3d at 444 ("Res judicata 'is mandated by public necessity; there must be an end to litigation at some point, or else the legal system would become so bogged down that nothing would ever remain decided.'" (quoting *Mentock v. Mentock*, 638 P.2d 156, 158 (Wyo. 1981)).

[¶46]   Res judicata generally applies to child custody and visitation orders.  *Bishop*, ¶ 11, 404 P.3d at 1173.  However, we have recognized:

[A]pplication of res judicata to a petition for modification of child custody [or visitation] is not appropriate where there has been a "material or substantial change in circumstances" with respect to the initial custody [or visitation] determination. [*Mentock*, 638 P.2d at 158]. In that instance, res judicata does not apply because "[the] modification proceeding involves new issues framed by facts differing from those existing when the original decree was entered. A new adjudication of the rights of the parties must be made. For all intents and purposes it is a separate and distinct case from the original proceeding." *Leitner v. Lonabaugh*, 402 P.2d 713, 719 (Wyo. 1965).

*Arnott*, ¶ 13, 293 P.3d at 444-45.

[¶47]   In this case, the district court determined Father's move to Worland constituted a material change in circumstances justifying it revisiting its previous visitation order and deciding what modification, if any, was in FIH's best interests.  Mother did not appeal from that determination.  Because there has been a material change in circumstances since the

15

court's previous custody and visitation orders, res judicata does not apply. Put simply, this proceeding involved a different issue than was previously addressed in the initial custody and visitation proceedings—whether it was in FIH's best interests to modify the court's previous visitation order, in particular its supervision and location components.

[¶48] Mother argues the court was barred under res judicata from considering her being HIV positive and the possibility she will abscond with FIH because neither constitutes a material change in circumstances. According to Mother, no new evidence was provided regarding either matter. Mother is simply wrong that there was no new evidence concerning these matters. Since the previous custody and visitation order, Mother stopped taking her HIV medication which resulted in her being contagious, Mother talked with FIH about taking her to Africa, and Mother's family posted on social media about seeing FIH soon. In any event, as we explained above, upon a finding that Father's relocation constituted a material change in circumstances, the court was permitted to reopen the visitation order and make an independent determination about what, if any, modification is in FIH's best interests. *Ianelli*, ¶¶ 25-26, 444 P.3d at 67-68; *Booth*, ¶ 21, 432 P.3d at 909.

[¶49] Mother suggests a court is barred by res judicata from relying on a parent's history when evaluating whether a modification of visitation is in a child's best interests. Mother cites no legal authority for such proposition. Because her argument is not supported by any legal authority, we need not consider it. *Kruckenberg v. Ding Masters, Inc.*, 2008 WY 40, ¶ 25, 180 P.3d 895, 903 (Wyo. 2008) (citations omitted). Nevertheless, even in termination of parental rights proceedings, where a parent's fitness must be determined as of the time of the termination proceedings, we have held a court need not "ignore evidence of a parent's previous unfitness" because "evidence of past behavior is plainly relevant in determining current parental fitness." *Matter of GGMC*, 2020 WY 50, ¶ 25, 460 P.3d 1138, 1146 (Wyo. 2020) (quotations and citations omitted). So too here. Mother's previous attempt to abscond with FIH provided important context to her recent conversations with FIH and her family's social media posts. Similarly, Mother being HIV positive remained relevant given her unilateral decision to stop taking her HIV medication contrary to medical advice. To the extent she claims the court impermissibly admitted evidence concerning these matters, her argument is "fundamentally flawed, because res judicata is not a rule of evidence." *Rigdon*, ¶ 12, 421 P.3d at 1073 (italics omitted).

[¶50] Finally, Mother claims the court violated res judicata by attaching its previous orders to its current order "[f]or the sake of brevity" rather than merely incorporating them by reference. She says as a result of the court attaching the orders, "any school, medical provider, or organization that requests a copy of the . . . [o]rder will receive way more private and personal information than necessary," which impacts not only the parents but FIH as well. Again, Mother provides no legal authority for the proposition that res judicata prohibits a court from attaching previous orders to a current order. Nevertheless, the proceedings are not confidential, and the orders have been appropriately redacted to protect FIH's identity.

16

***B. Did the district court violate Mother's constitutional right to familial association by failing to provide a means by which she can graduate to unsupervised visitation?***

[¶51]  Mother argues the district court violated her constitutional right to familial association by failing to provide any mechanism for her to graduate to unsupervised visitation.  She claims such omission requires her to resort to more litigation if she wants more time with FIH and to show a material change in circumstances warranting modification.  She says it is unlikely she will be able to show a material change in circumstances, especially because a parent's progress does not amount to a material change in circumstances.  She also argues the court has foreclosed her from claiming a change in circumstances based on Father's relocation because it indicated in a footnote "[its] intent" that supervised visits take place wherever Father and FIH reside.  Indeed, she claims that since the court's order, Father has relocated to Cheyenne and supervised visits are occurring there.  Mother maintains the court's order essentially bars her from ever having unsupervised visitation with FIH.

[¶52]  Parents have a fundamental right to associate with their children.  *Arnott*, ¶ 30, 293 P.3d at 454.  Mother, however, provides no legal authority for the proposition that a court's failure to provide a mechanism for a parent to graduate from supervised to unsupervised visitation violates that right and we have found none.  Indeed, Mother retains the right to visit with FIH and the right to seek modification of the visitation order, including its requirement that visitation be supervised.  Ironically, while Mother sought to lift the supervision requirement of the visitation order, she did not seek an increase in the amount of visitation, which is currently only 4-8 hours of in-person visitation per month.

[¶53]  Mother is correct that to seek modification of visitation, including its supervision component, she will have to show a material change in circumstances and that unsupervised visitation is in FIH's best interests.  *Arnott*, ¶ 14, 293 P.3d at 445 ("The burden is on the party seeking modification of a custody order to prove, first, that there has been a material change in circumstances, and second, that modification would be in the best interests of the children." (citation omitted)).  However, nothing in the court's order prevents her from doing so.  It is entirely within Mother's control.

## CONCLUSION

[¶54]  The district court did not abuse its discretion or violate Mother's constitutional right to familial association by denying Mother's request to end supervised visitation.

[¶55]   We affirm.